UNITED STATES of America, Appellee,

v.

Amel F. LUETH, Appellant.

UNITED STATES of America, Appellee,

v.

Patrick J. McMAHON, Appellant.

UNITED STATES of America, Appellee,

v.

Susan M. LUETH, Appellant.

UNITED STATES of America, Appellee,

v.

Timothy M. McCARTHY, Appellant.

Nos. 85–1981, 85–1982, 85–1984 and 85–2037.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1986.

Decided Dec. 16, 1986.

Lawrence F. Scalise, Des Moines, Iowa, for A. Lueth.

John J. Reefe, Jr., Omaha, Neb., for McMahon.

Donald W. Kleine, Omaha, Neb., for McCarthy.

Paul H. Rosenberg, Des Moines, Iowa, for S. Lueth.

John Jarvey, Washington, D.C., for U.S.

Before JOHN R. GIBSON, Circuit Judge, FAIRCHILD,* Senior Circuit Judge, and MAGILL, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

This group of appeals arises from the purchase, distribution, and sale of large amounts of marijuana and cocaine between 1980 and 1985. Amel Lueth was convicted in the district court[1] of knowingly engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848 (1982); several counts of conspiracy to distribute, possession with intent to distribute, or distribution of marijuana and cocaine; conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (1982); and income tax evasion and filing false income tax returns in violation of 26 U.S.C. §§ 7201, 7206(1) (1982). Susan M. Lueth, his wife, Timothy McCarthy, and Patrick J. McMahon were convicted of various counts relating to conspiracy, possession, and distribution of marijuana and cocaine. On appeal, the defendants raise as error the district court's denial of their motions to suppress evidence seized pursuant to a warrant based on what they contend was a fatally deficient affidavit; the intrusion of the district judge into their trial as a prosecutor; the district court's refusal to sever the tax charges from the drug charges; and the submissibility of the continuing criminal enterprise charge against Amel Lueth. We affirm the convictions on each of the counts as to each of the defendants.

The evidence produced at the four-week trial of Amel Lueth and his codefendants established that Amel Lueth was the head of a major marijuana and cocaine trafficking organization centered in Council Bluffs, Iowa, and Omaha, Nebraska. He began distributing large quantities of marijuana to Raymond Hughes in Council Bluffs prior to 1979. In the summer of 1979, Lueth traveled to Florida, intending to purchase marijuana. He was unable to obtain the marijuana, however, and he returned to Council Bluffs with four kilograms of cocaine. There was evidence that the following year the Lueth organization was embarrassed by the sale of a large quantity of cocaine containing spoiled diluent. This cocaine was later "reconstituted" and resold with a different diluent.

There was evidence that Lueth's mother, Laura Lueth, was involved in his activities. In 1979, Lueth set up a corporation through which he received funds from his parents' farm in Manilla, Iowa. In turn, he invested some of the profits of his drug operation in the farm, purchasing land and farm equipment. The Lueth organization

---

* The HONORABLE THOMAS E. FAIRCHILD, Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. The Honorable Harold D. Vietor, Chief Judge, United States District Court for the Southern District of Iowa.

also used the farm as a storage facility for drugs and money.

By 1981 Lueth and his associates were using the facilities and premises of Horticulture Supply, Inc., located in Omaha, to receive and repackage large quantities of marijuana, some of which came from Illinois, Delaware, and Florida. Lueth organized trips to transport this marijuana, and often flew to Florida to direct the actual purchase of the drugs, leaving codefendant Patrick McMahon or government witness Greg Bixler to drive a van to Florida and back to Iowa, carrying the marijuana. Bixler purchased a fraudulent birth certificate from Lueth at the Horticulture Supply facility; Lueth was once seen with a dozen such certificates, used to obtain fraudulent driver's licenses, in a briefcase.

Bixler and Sally Pflug, another government witness, were expelled from the Lueth organization in 1981. Both had been accused by Lueth of stealing $100,000 of Lueth's money. Evidently, all three were also involved in a romantic triangle. After their expulsion, Laura Lueth discovered the money in the family freezer at the Iowa farm in a package labelled "rib eyes."

By 1983, the Lueth organization was purchasing high-quality Mexican marijuana from a supplier in Tucson, Arizona. There was evidence that Lueth employed McMahon to haul the marijuana to Council Bluffs. Additional purchases were evidently made in San Francisco, California. On March 24, 1983, law enforcement officials searched the residences of Lueth and several of his codefendants. This search led to the discovery of records of the trafficking activities, and the seizure of a GMC motor home, a Saab motor vehicle, a large sum of money, and quantities of marijuana, cocaine, and Valium.

Shortly after the 1983 search, Lueth and several other members of his organization moved away from Council Bluffs. There was evidence, however, that they continued to use Council Bluffs and Omaha as drug storage and distribution centers during 1983 and 1984. Following the return of an indictment against Lueth and his codefend-

ants on February 8, 1985, federal and state officials searched the Manilla, Iowa, farm and discovered five bags of silver coins, records detailing Lueth's investments in farm land and equipment, and records of ongoing narcotics trafficking.

As only Amel Lueth raises the question of the sufficiency of the evidence to support his conviction, we need not further elaborate upon the facts developed at the trial. Insofar as further factual details are relevant to the contentions of the parties, we will relate them presently.

A single multi-count, multi-party indictment was filed against Amel Lueth, Susan Lueth, Patrick McMahon, Timothy McCarthy, and other alleged members of the Lueth organization. All defendants moved to suppress the fruits of the 1983 search because the affidavit underlying the warrant refers to a confidential informant as being of proven reliability when the agent making the affidavit knew that the Federal Bureau of Investigation, the Douglas County Sheriff's office, and the Omaha Police Department had ceased using him as an informant. The district court denied this motion.

The trial followed. Amel Lueth was convicted under Count I of the indictment of engaging in a continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848. Amel Lueth, Susan Lueth, Patrick McMahon, and Timothy McCarthy were convicted under Count II of conspiracy to distribute marijuana and cocaine in violation of 21 U.S.C. § 846. The jury convicted Amel Lueth of possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2 under Count III. Amel Lueth was convicted of possession with intent to distribute marijuana under Count VI, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2. He was convicted under Count VII of an additional count of possession with intent to distribute cocaine. Amel and Susan Lueth were convicted under Count VIII of the lesser included offense of possession of diazapam (Valium) in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(2). Amel

Lueth and Susan Lueth were convicted under Count IX of an additional count of possession with intent to distribute cocaine. Both were also convicted under Count X of an additional count of possession with intent to distribute marijuana. Amel Lueth was convicted under Count XI of another count of possession with intent to distribute cocaine. Under Counts XIII, XIV, XV, and XVI, Amel Lueth was convicted of conspiracy to defraud the United States of income tax, in violation of 18 U.S.C. § 371, filing false income tax returns in 1979 and 1980, in violation of 26 U.S.C. § 7206(1), and income tax evasion, in violation of 26 U.S.C. § 7201.

Amel Lueth was sentenced to twenty years on Count I, and received sentences ranging from one year to fifteen years on the remaining counts. All sentences were to run concurrently; twenty years without parole was the maximum sentence imposed. Susan Lueth was sentenced to one year and one day on Count II and three months on Count VIII, to run concurrently, and was placed on three years probation following release as to Counts IX and X. Patrick McMahon was sentenced to five years on Count II. Timothy McCarthy was sentenced to four years on Count II. Various other members of the Lueth organization, not involved in this appeal, pled guilty or were convicted by the jury, and were sentenced under the several counts of the indictment. Some defendants were dismissed or acquitted.

On appeal, Amel and Susan Lueth, and Timothy McCarthy contend that the district court erred in refusing to suppress the evidence seized in March, 1983, pursuant to a search warrant that they argue was based on an affidavit that did not establish probable cause and was deficient under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Amel Lueth also contends that the trial judge abandoned his neutral role and injected himself into the trial as prosecutor. Patrick McMahon argues that the district court erred in refusing to sever the tax charges against Amel Lueth from the drug charges against the remaining defendants. And, finally, Amel Lueth argues that the government did not make a submissible case against him on the charge that he engaged in a continuing criminal enterprise under Count I of the indictment.

## I.

Amel Lueth, Susan Lueth, and Timothy McCarthy argue that the district court erred in denying their motion to suppress the evidence seized during the search of their premises on March 24, 1983. They contend that the affidavit underlying the search warrant, prepared by Donald E. Nelson, a special agent of the Drug Enforcement Agency, contains a material, deliberate falsehood, and that suppression is mandated by *Franks v. Delaware, supra.* Alternatively, they argue that Special Agent Nelson omitted information material to the magistrate's probable cause determination, and that this omission rose to the level of a deliberate, material falsehood, thus also requiring suppression under *Franks.* They also argue that the warrant affidavit is not sufficient to establish probable cause under the standards articulated by the Supreme Court in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Our review of the district court's denial of the motion to suppress is governed by several well-known principles:

> Under the standard established in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the task of a magistrate issuing a search warrant is to determine whether, in light of all the circumstances set forth in the affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis, for ... conclud[ing]' that probable cause existed." *Id.* at 238–39, 103 S.Ct. at 2332 * * *. Courts are to interpret affidavits in a non-technical common-sense fashion, and the magistrate's determination of

probable cause is entitled to great deference.

*United States v. Arenal*, 768 F.2d 263, 266 (8th Cir.1985).

We will uphold the district court's disposition of the motion to suppress unless it is clearly erroneous. *United States v. Henry*, 763 F.2d 329, 331 (8th Cir.1985).

### A.

Special Agent Nelson's affidavit sets forth in great detail the structure and activities of the Lueth organization. Much of this information was provided by Greg Bixler, who is identified in the affidavit as "Informant No. 1." The affidavit states, in reference to Bixler, that

> Informant No. 1 is an individual of proven reliability. Informant No. 1 has, on one occasion, made a controlled purchase of cocaine for law enforcement officers from an individual who the informant had earlier identified as a person actively distributing cocaine, a controlled substance. Within the past two months, this informant has assisted affiant in a separate investigation of an individual, who shall remain unidentified in this affidavit, who is actively distributing cocaine. Assistance by this informant resulted in the undercover purchase of cocaine by affi-

ant from this individual. The investigation is ongoing.

The defendants contend that the first sentence of Nelson's description of Bixler —"Informant No. 1 is an individual of proven reliability"—is either a deliberate falsehood or was made in reckless disregard for the truth. This contention is based on the fact that Nelson knew, at the time he prepared the affidavit, that the FBI, the Douglas County Sheriff's office, and the Omaha Police Department were no longer using Bixler as an informant.[2]

The district court rejected this contention, following a hearing on the motion to suppress. It found that Bixler had proven to be reliable as to information about the drug trafficking activities of third parties, although he may not have been completely candid about his own activities. It further found that the fact that other law enforcement agencies chose not to use Bixler as an informant because of his suspected criminal activities did not make Nelson's characterization of Bixler a false statement within the meaning of *Franks*, given his "track record" as otherwise revealed on the face of the affidavit and at the suppression hearing.

■ We have reviewed the record of the suppression hearing, and we cannot say that the district court's findings were clear-

---

**2.** The defendants particularly stress a letter dated February 7, 1983, from the FBI office in Omaha to the DEA office in St. Louis, Missouri, which states:

> Between December 29, 1982, and February 4, 1983, the FBI in Omaha has conducted an inquiry regarding the suitability of [Greg Bixler] to be utilized as a source for the Omaha Office of the FBI. This inquiry revealed that it is strongly alleged that Bixler is currently dealing heavily in narcotics in the Omaha area, and has in the past been not entirely truthful with other narcotics investigators of the Omaha area.
>
> Accordingly, the Omaha Office of the FBI is no longer utilizing this individual as a criminal informant.

They also rely on a memorandum dated February 14, 1983, from the Omaha DEA office to the St. Louis DEA office, written in response to the above letter, which states in reference to Bixler, "as [he] has admitted to his own past involvement in drug trafficking activities, his credibili-

ty is open to question and scrutiny." This same memorandum, however, also states

> I have no knowledge of any criminal activity by [Bixler] since his current association with this office. In view of the significance of the intelligence and evidence being offered by [him], I strongly believe that [his] utilization by [this office] should continue with the usual caution and corroboration.

Nelson testified at the suppression hearing that he was aware of the contents of these two letters at the time he prepared his affidavit. He also testified that he was at that time aware, through "shop talk," that the Omaha Sheriff's Office and Police Department, which had formerly used Bixler as an informant, were no longer doing so because they suspected that Bixler was concealing his own continuing drug trafficking from them, evidently because Bixler was disenchanted with the way the local authorities were conducting their narcotics investigations.

ly erroneous. *See United States v. Maull*, 773 F.2d 1479, 1487–88 (8th Cir.1985). Bixler demonstrated his reliability to Nelson and the DEA. Nelson also testified that he was aware of the circumstances surrounding the FBI and local law enforcement agencies' termination of Bixler's services, and that his confidence in Bixler's reliability remained high. Addtionally, an FBI agent testified that his agency had stopped using Bixler as an informant because of concerns about his drug trafficking rather than about his reliability.[3] We conclude, as did the district court, that the defendants failed to meet their burden under *Franks*, 438 U.S. at 155–56, 98 S.Ct. at 2676, of showing that Nelson's statement regarding Bixler's "proven reliability" was either a deliberate falsehood or was made with reckless disregard for the truth. Nelson "believed or appropriately accepted," *id.* at 165, 98 S.Ct. at 2681, his affidavit to be true.

The defendants also contend that suppression is warranted because Special Agent Nelson did not include in his affidavit the fact that the FBI and local law enforcement agencies had recently stopped using Bixler as an informant. They argue that the magistrate was entitled to this information in order to assess Bixler's reliability. The same analytical process used to determine whether an affidavit contains a material falsehood is used to determine whether an omission will vitiate a warrant affidavit under *Franks*. *See United States v. Dennis*, 625 F.2d 782, 791–92 (8th Cir.1980); *United States v. House*, 604 F.2d 1135, 1141 n. 9 (8th Cir.1979), *cert. denied*, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980). A panel of this court has recently considered this question at length, and held that the defendant has to show "(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading * * *; and (2) that the affidavit if supplemented by the omitted infor-

mation would not have been sufficient to support a finding of probable cause." *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir.1986) (citations omitted). With regard to the second element, we emphasized that suppression is warranted *only* if the affidavit as supplemented by the omitted material *could not* have supported the existence of probable cause. *Id.* at 962.

Even if we assume that Nelson omitted the information regarding Bixler's reliability with the intent to mislead the magistrate, a factual question which the district court implicitly resolved against the defendants, we do not believe that the supplemented affidavit could not have supported the existence of probable cause. The affidavit, if supplemented, would state that the FBI and local law enforcement agencies no longer used Bixler as an informant because he was suspected of having continued to traffic in drugs. It would, however, still refer to him as being of "proven reliability" as far as Nelson and the DEA were concerned. It would still refer to two separate occasions on which Bixler had provided reliable information to the DEA. It would also still contain additional indicia of reliability: Bixler's description of the Lueth organization was both detailed and based on his personal observations, *see United States v. Ellison*, 793 F.2d 942, 946–47 (8th Cir.1986) (detail, internal consistency, and first-hand knowledge of informant important factors in determination of probable cause); Bixler's description of the Lueth operation was corroborated in several minor details by two other informants and by police surveillance, *see Arenal*, 768 F.2d at 267 ("innocent details" can provide sufficient corroboration to support finding of probable cause); *United States v. Robinson*, 756 F.2d 56, 60 (8th Cir.1985) (same); and, Bixler's information implicated himself in the activities of the Lueth organization. *See Reivich*, 793 F.2d at 959–60 ("deals" with

---

**3.** Special Agent Johnny Evans, the author of the FBI letter of February 7, 1983, testified at the suppression hearing the FBI was concerned about Bixler's reliability regarding his own ac-

tivities. He stated that the FBI suitability inquiry revealed that Bixler was reliable as to information he supplied to local law enforcement agencies about third parties.

the police or the prosecutor do not necessarily weaken the inference of reliability of statements against penal interest). We conclude that, under the "totality of the circumstances" the issuing magistrate would still have had a "substantial basis" for finding that Nelson's affidavit supported the existence of probable cause. *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. "Our touchstone is 'probability,' and not 'certainty,' and one-hundred percent reliability on the part of [Bixler] was not crucial to the issuance of the warrant." *Reivich,* 793 F.2d at 963.

### B.

■ What we have said thus far about probable cause as it relates to the *Franks* issue applies with equal force to the defendants' contention that the warrant affidavit was insufficient to establish probable cause under *Illinois v. Gates.* Amel Lueth complains that much of Bixler's information was stale. However, Lueth's criminal activities were continuous and ongoing, *see Ellison,* 793 F.2d at 947, and Bixler's description of the operational details—particular vehicles and residences used by the Lueth organization to transport and store drugs—had been corroborated by recent police surveillance. *See Robinson,* 756 F.2d at 60. Timothy McCarthy urges this court to engage in a hypertechnical dissection of the warrant affidavit as to particular facts relating to his residence, the reliability of Bixler, and the significance of details observed by the police at his home. We decline to do so. *See Arenal,* 768 F.2d at 266–67. There was sufficient information in the affidavit regarding how McCarthy's residence fit into the Lueth organization's activities, and how various vehicles identified with Lueth and his associates were seen at McCarthy's residence, to justify the issuance of the warrant. We have reviewed Nelson's affidavit, the record of the suppression hearing, and the arguments of Lueth and McCarthy. We conclude that the district court's finding that probable cause existed to search Lueth's and McCarthy's residences is not clearly erroneous. *Henry,* 763 F.2d at 331.

### II.

Amel Lueth argues that the trial judge improperly abandoned his neutral and impartial role and injected himself into the trial on behalf of the prosecution. Specifically, he points to ten separate occasions, over the course of the four-week trial, where he claims the trial judge aided and counseled the government's attorney in the presentation of his case, thus giving the jury "the impression of onesidedness," *U.S. v. Ellis,* 747 F.2d 1205, 1208 n. 2, (8th Cir.1984), and warranting reversal and a new trial.

■ We have always been reluctant to disturb a judgment of conviction "by reason of a few isolated, allegedly prejudicial comments of a trial judge," *United States v. Bland,* 697 F.2d 262, 265 (8th Cir.1983), particularly in a long trial. *Id.* Our task is to balance and weigh the comments of the judge against the overall fairness of the trial. *United States v. Singer,* 710 F.2d 431, 436 (8th Cir.1983); *Bland,* 697 F.2d at 265. "[T]he balance is adversely tipped against the defendant in a criminal trial where the judge's role loses its color of neutrality and tends to accentuate and emphasize the prosecution's case." *Bland,* 697 F.2d at 265.

■ We need not detail each statement by the trial judge that Lueth claims was improper. Of the ten, seven were made outside the jury's presence. Our cases addressing impartiality of trial judge conduct stress the importance of the *jury's* perception that the judge is favoring the prosecution or believes the defendant to be guilty. *See United States v. Holmes,* 794 F.2d 345, 349 (8th Cir.1986) (sidebar conference regarding government's burden of proof did not give impression of partiality to the jury); *Singer,* 710 F.2d at 436 (impermissible effects of trial judge's conduct were to (1) cast prosecutor in role of underdog "in the eyes of the jury," and (2) to "suggest to the jury" that the judge favored the government's position); *Bland,* 697 F.2d at 265–66 ("A judge's slightest indication that

he favors the government's case can have an immeasurable effect upon a jury."); *see also Llach v. United States*, 739 F.2d 1322, 1330 (8th Cir.1984) (no prejudice where most allegedly improper comments were made outside of hearing of jury). We do not say that it is impossible for statements outside of the jury's hearing to create, when viewing the record as a whole, an impression in the courtroom of onesidedness or an atmosphere of favoritism, or to provide insight into the attitude and feelings of the trial judge. *Cf. Bland*, 697 F.2d at 266. The comments Lueth relies on,[4] however, do not suggest to us bias or partiality, but rather, properly judicious efforts to guide the course of the trial.

■ Lueth also directs our attention to three exchanges between the trial judge and the government's attorneys that took place before the jury. The first occured during the testimony of Greg Bixler. Bixler had earlier testified about various activities of the Lueth organization at Horticultural Supply, Inc. After a lunch recess, the prosecutor began inquiring about other activities taking place at Horticultural Supply. The trial judge interrupted the questioning to ask the prosecutor whether he was being repetitive, as follows:

Q. [By Government Counsel]: On those occasions, who did you see in there helping break down these marijuana bales?

A. Charlie Henriksen.

The Court: Excuse me please. Where's this?

[Government Counsel]: At Horticultural Supply, Your Honor.

The Court: Didn't we go through all this this morning?

[Government Counsel]: Just the first time he'd been there.

\* \* \* \* \* \*

[Defense Counsel]: I'm going to object to this line of testimony. My notes reflect they talked about the second time.

\* \* \* \* \* \*

The Court: But apparently he's going back to that to bring out different detail that he did not ask about this morning. Is that what you're doing?

[Government Counsel]: Your Honor, my recollection is that only the first incident is what I asked about this morning with respect to breaking down marijuana. I know I did not talk about the—receiving the phony driver's license on another occasion.

The Court: Well, you had him testify about being there on other occasions and what he observed there and who was there, about a police car cruising around also, but go ahead. If you've got more detail, go to it. Bring it out.

Tr. 906–07.

We do not believe that the judge's remark that the government should "go to it," immediately following what was in essence the judge's prompting of a defense objection, amounted to anything more than a direction for counsel to proceed. It is not, as Lueth argues, encouragement for government counsel. Nor do we believe the jury would understand this remark as showing bias or favoritism by the judge.

■ Later in the trial, and again before the jury, the trial judge sustained a defense objection that had earlier been raised and overruled. He did so by telling government counsel: "Don't push it." Tr. 1482. Lueth claims that this remark created the impression that the judge was helping the government try its case. We do not believe the jury would so interpret it. The judge was simply sustaining a defense objection, and cautioning government counsel to limit further examination.

---

**4.** These comments include an admonition to the government attorney to "sharpen it up a bit," Tr. 27, and stop wandering in questioning the witnesses, a discussion of an insufficient evidentiary foundation in response to a defense objection, Tr. 154–55, an extended colloquy on the purpose for which a sales receipt was being offered into evidence by the government, again resulting in the sustaining of a defense objection, Tr. 437–39, an admonition to the government to stop asking leading questions and to stop misstating the evidence, Tr. 650–53, and an explanation of an evidentiary ruling. Henricksen Tr. 48–50.

■ Finally, Lueth argues that the following exchange involves the trial judge in educating government counsel:

Q. [By Government Counsel]: Were certain individuals designated as drivers for Mr. Lueth?

A. Yes.

[Defense Counsel]: Objection, Your Honor. Ask that my objection precede the answer. It's clearly hearsay. I think it's calling for an opinion and conclusion.

*　*　*　*　*　*

The Court: We'll receive the answer. The objections will be overruled, and the hearsay will be under the Bell procedures.

A. Pat was a driver, Pat McMahon, and Willie also done some driving.

*　*　*　*　*　*

The Court: I've got to have this clarified. Are you saying you personally saw that, or are you saying you were told that by somebody?

The Witness: Yes, I was told.

The Court: By whom?

The Witness: I don't recall.

The Court: You don't recall who told you that? Well, it's stricken then. The jury will disregard it. The objection is sustained, and the jury will disregard the answer concerning who drove.

Henrickson Tr. 43–48.

We believe that the judge was asking entirely appropriate questions in order to determine whether the testimony was admissible, in light of the defense objection. *See Holmes,* 794 F.2d at 349; Fed.R.Evid. 614(b). These remarks would not create the impression that the judge was educating counsel or aiding him in trying his case. Their net effect, establishing sufficient record to sustain the defense objection, deprives Lueth of any claim of error or prejudice.

We have carefully reviewed the transcript of the trial, paying particular attention to those comments of the trial judge cited by Lueth as improper.[5] We conclude that there was no error and that the judge did not "lose [his] color of neutrality [or] tend to accentuate and emphasize the prosecution's case." *Bland,* 697 F.2d at 265.

**III.**

Patrick McMahon contends that the district court erred in refusing to sever the drug distribution conspiracy charge against him under Count II of the indictment from the charges against Amel Lueth of income tax evasion, filing false income tax returns, and conspiracy to defraud the United States under Counts XIII, XIV, XV, and XVI of the indictment. He argues that these charges were misjoined under Rule 8, Fed.R.Crim.P., because the drug trafficking in which he was involved was completely separate from Lueth's tax evasion scheme. He also contends that the joinder was prejudicial and that the district court abused its discretion in refusing to sever the charges under Rule 14, Fed.R.Crim.P.

■ The parties have failed to provide us with sufficient record to determine whether McMahon renewed his pretrial motion for severance at the close of the government's case or at the close of all the evidence. The government states that he did not. Such a failure is deemed to be a waiver of a motion to sever. *United States v. Mansaw,* 714 F.2d 785, 790 (8th Cir.), *cert. denied,* 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983); *United States v. Reed,* 658 F.2d 624, 629 (8th Cir.1981), *cert. denied,* 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982). In any event, when considered on the merits, McMahon has not met his burden of showing clear prejudice from the district court's refusal to sever, *United States v. Knife,* 592 F.2d 472, 480 (8th Cir.1979), or that the joinder, if im-

---

5. In addition to the comments cited by Lueth, we have discovered a number of similar statements by the judge directed to defense counsel. *See, e.g.,* Tr. 14, 20, 146–47, 170–71, 360, 435, 526, 545. We believe the record shows that the trial judge was quite properly attempting, in a fair and impartial manner, to move this lengthy and complex trial along as smoothly as possible, and that all of his comments were directed to that end.

proper, was more than harmless error. *United States v. Lane,* — U.S. —, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986).

### A.

■ Rule 8(b) provides that two defendants may be charged in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions." Fed.R.Crim.P. 8(b). McMahon argues that Lueth's tax evasion scheme and the drug conspiracy were not part of the same series of acts or transactions; McMahon claims he was "completely disassociated" with Lueth's plan to evade paying his federal income taxes. The government contends that Lueth's activities were a "systematic and sophisticated portion" of the drug conspiracy—Lueth was laundering the drug money by disguising it as legitimate farm income. The government's position finds support in the decisions of our sister circuits. *See United States v. Wirsing,* 719 F.2d 859, 863 (6th Cir.1983); *United States v. Wilson,* 715 F.2d 1164, 1171–72 (7th Cir.), *cert. denied,* 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983); *United States v. Anderson,* 642 F.2d 281, 284 (9th Cir. 1981). We need not, however, resolve this dispute because even if the district court erred in refusing to sever the tax evasion charges, we conclude that this error was harmless.[6] Fed.R.Crim.P. 52(a).

■ McMahon complains that he was prejudiced by evidence introduced by the government to support the tax evasion charges of large expenditures of cash by Lueth. We are satisfied that he was not harmed by this claimed joinder error or the introduction of this evidence. The trial court admonished the jury at the time the evidence was introduced that it was re-

ceived only against Lueth under the appropriate counts of the indictment; this admonition was repeated before the jury retired to consider its verdict. We have noted the relevance of cautionary and limiting instructions in assessing the possible prejudice from misjoinder. *United States v. Givens,* 712 F.2d 1298, 1301 (8th Cir.1983), *cert. denied,* 465 U.S. 1009, 104 S.Ct. 1005, 79 L.Ed.2d 237 (1984). More importantly, however, evidence of Lueth's expenditures would have been admissible under Count I of the indictment, charging Lueth with engaging in a continuing criminal enterprise, regardless of whether the tax evasion charges were severed. One of the elements necessary to support a CCE conviction is proof that the defendant received substantial income by violating the federal narcotics laws. *United States v. Becton,* 751 F.2d 250, 254 (8th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *United States v. Samuelson,* 697 F.2d 255 (8th Cir.1983), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1314, 79 L.Ed.2d 711 (1984). Showing that Lueth derived substantial unreported income from his drug trafficking is the exact purpose for which the evidence complained of was admitted. McMahon does not contend, nor do we doubt, that the CCE charge arose from the same series of acts and transactions with which McMahon was charged under Count II of the indictment, and was thus properly joined under Rule 8(b). *See Wilson,* 715 F.2d at 1171–72 (conspiracy to distribute cocaine, CCE, and tax evasion counts all properly joined under Fed.R.Crim.P. 8).

### B.

■ McMahon also contends that the district court's refusal to sever the charges

---

6. We recognize that this is a departure from our former rule that misjoinder under Rule 8(b) mandated severance without regard to the prejudicial effect on the defendant. *See, e.g., United States v. Bledsoe,* 674 F.2d 647, 657–58 (8th Cir.), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). The Supreme Court recently held, however, in *United States v. Lane,* — U.S. —, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), that an error involving Rule 8(b) misjoinder

requires reversal only if it resulted in "actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* 106 S.Ct. at 732 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). While we are required to follow earlier decisions of this court, which establish the law of this circuit, it is evident that the law of this circuit must give way to the later decisions of the Supreme Court.

was an abuse of discretion under Rule 14. He complains that there was a prejudicial spillover from the evidence of Lueth's cash expenditures, and that the jury was unable to compartmentalize the evidence that was applicable only to Lueth on the tax charges and that which was applicable to McMahon on the conspiracy charge.

In considering whether "clear prejudice," *Mansaw*, 714 F.2d at 790, resulted from the district court's denial of his motion to sever, McMahon has correctly focused on whether the jury could reasonably be expected to compartmentalize the evidence against him and against Lueth. *Reed*, 658 F.2d at 629; *Knife*, 592 F.2d 480. We believe that it could. The district court took several commendable precautions to aid the jury in its task of sorting through the various charges, defendants, and pieces of evidence. At the beginning of the trial, the court directed that a large chart identifying the defendants and the counts of the indictment be placed on the wall in view of the jury. This chart was modified as counts were dismissed or as defendants pleaded guilty or were dismissed. As each witness testified, the court directed the government to specify the count or counts to which the testimony would be directed. The same was done for each exhibit. Also, the exhibits relating primarily to the drug counts were marked with the prefix "D" and the exhibits relating primarily to the tax counts were marked with the prefix "W". The court cautioned the jury on numerous occasions that they should consider testimony and exhibits only with respect to the charges enumerated by the government. Further protection against prejudicial "spill-over" lay in the fact that the evidence pertaining to the tax charges consumed only two days of the four-week trial.

Our conclusion that the jury was able to compartmentalize the evidence against Lueth and his codefendants is further strengthened by the fact that the jury acquitted four defendants who had been charged with conspiracy under Count II of the indictment along with Lueth and McMahon. We have characterized this type of result before as "convincing evidence that the jury was able to separate the proof as to each defendant." *Reed*, 658 F.2d at 630; *see also United States v. Brim*, 630 F.2d 1307, 1310 (8th Cir.1980), *cert. denied*, 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981). McMahon has not shown that he was clearly prejudiced by the joinder, and thus we reject his claim that he is entitled to reversal and a new trial.

## IV.

Amel Lueth argues that the evidence was insufficient to support his conviction of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(b). The government must prove five elements to establish a CCE violation. They include:

1) a felony violation of the federal narcotics laws;

2) as part of a continuing series of violations;

3) in concert with five or more persons;

4) for whom the defendant is an organizer or supervisor;

5) from which he derives substantial income or resources.

*United States v. Lewis*, 759 F.2d 1316, 1331 (8th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985); *Becton*, 751 F.2d at 254.

Lueth's specific contention is that the government failed to prove that he acted as a supervisor or organizer of five or more persons. He does not challenge the proof of the other elements of the CCE conviction, and we are satisfied that those elements have been proved by sufficient evidence.

"In reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the government, resolve evidentiary conflicts in favor of the government, and accept as established all reasonable inferences that may logically be drawn from the evidence." *United States v. Newton*, 756 F.2d 53, 54 (8th Cir.1985). The supervisory relationship specified in the CCE statute need not have existed at the same time with regard to all five persons, *Becton*, 751 F.2d at 255, and the five persons need not act together. *Id.; Lewis*,

759 F.2d at 1331. Also, the same type of supervision need not be exercised over each of the five persons, and the government does not have to show that the supervisor had personal contact with each individual. *Becton*, 751 F.2d at 255. Viewing the evidence in light of these principles, we conclude that the government presented sufficient evidence to prove that Lueth organized, supervised, or managed at least five other persons in his criminal enterprise.

The record shows that, beginning in 1980, Lueth told Phillip Gain, Timothy McCarthy, and Larry Charles Henrickson to purchase large quantities of marijuana at William Kloewer's house. They were also directed to pay Kloewer for the marijuana, who was told by Lueth to receive the money. Thus, Lueth used and directed William Kloewer as a distributor of marijuana, and used Kloewer's residence as a "stash house."

In the summer of 1979, Lueth purchased four kilograms of cocaine. There was evidence that he employed Gain and Randy Whitmore to dilute it at Gain's apartment. Lueth stored later shipments of cocaine at Gain's apartment, and paid Gain to deliver cocaine, at his direction, to Whitmore.

Greg Bixler testified that he became a member of the Lueth organization when he bought five pounds of the diluent "ultracaine" for Lueth at his direction. In 1980, Bixler, again at Lueth's direction, assisted Lueth in processing what was described as a "large pail" of cocaine. This pail had been delivered by Henrickson, under Lueth's instructions, to Lueth's parents' farm; Laura Jean Lueth, Lueth's mother, had stored the cocaine there for Lueth at his request.

During the summer of 1981, Bixler and Lueth flew together to Florida to purchase marijuana. Lueth instructed Patrick McMahon to drive to Florida and meet him, which he did. McMahon was late, however, in picking up his half of the marijuana. When Bixler unloaded his half of the marijuana in Iowa, he was assisted by Henrickson, again at Lueth's direction. Lueth sent Bixler to Florida again that summer to acquire a warehouse to facilitate Lueth's drug operation. Bixler was accompanied by Sally Pflug, whose affections eventually led to a falling out between Lueth and Bixler. Pflug returned to Iowa with Lueth, and at his direction she carried with her ten ounces of cocaine.

There was extensive evidence that Henricksen worked for Lueth, and was in fact one of Lueth's principal lieutenants. He was Lueth's bookkeeper. He transported drugs for Lueth on numerous occasions. He also sold drugs for Lueth. In 1983, he and McMahon, on Lueth's instructions, made several trips to Arizona and California to purchase marijuana. He, McMahon, and Kloewer repackaged the marijuana at Kloewer's residence.

There was sufficient evidence, therefore, for the jury to have found that Lueth controlled, managed, or supervised at least the following persons: Phillip Gain, Timothy McCarthy, Larry Charles Henrickson, William Kloewer, Randy Whitmore, Greg Bixler, Laura Jean Lueth, Sally Pflug, and Patrick McMahon. This satisfies the "five or more persons" element of his CCE conviction. Also, Lueth's actions with regard to these individuals—directing them to purchase, transport, store, and repackage narcotics—plainly satisfy the requirement that he act in a supervisory capacity. After reviewing the whole record, we conclude that the evidence against Lueth overwhelmingly supports his CCE conviction under 21 U.S.C. § 848(b).

### V.

■ McCarthy contends that the trial judge improperly supplemented one of the jury instructions in response to an inquiry from the jury after it had retired to deliberate the case. We conclude that the judge committed no error in responding to and attempting to eliminate the jury's confusion concerning the elements necessary to convict McCarthy.

Instruction No. 17, read to the jury before closing arguments, defined the criminal conspiracy with which McCarthy and his codefendants were charged under Count II of the indictment as having three essential elements, including:

(1) That from on or about August 1977 and continuing up to and including December 1984, in the Southern District of Iowa and elsewhere, two or more persons reached an agreement or understanding to commit the crime of knowingly or intentionally distributing cocaine and marijuana.

\*   \*   \*   \*   \*   \*

(3) That at the time the defendant joined in the agreement or understanding, he or she knew that the purpose of the agreement or understanding was to knowingly and intentionally distribute cocaine and marijuana.

The jury retired to deliberate the case after hearing the instructions and counsel's argument. After three days of deliberation, the jury submitted the following question to the trial judge: "There is disagreement among the jurors as to the meaning of instructions on Count 2. In order for a defendant to be found guilty in Count 2—must he/she be found guilty re: *both* marijuana and cocaine or can it be only one or the other?" The judge responded with the following supplemental instruction:

> I misled you in Instruction 17 in setting forth essential element (3) when I told you that the government must prove beyond a reasonable doubt that at the time the defendant joined in the agreement or understanding, he or she knew that the purpose of the agreement or understanding was to knowingly and intentionally distribute cocaine and marijuana. I should have told you, and I now instruct you, that the government must prove beyond a reasonable doubt that at the time the defendant joined in the agreement or understanding, he or she knew that the purpose of the agreement or understanding was to knowingly and intentionally distribute cocaine or marijuana or both.

McCarthy complains that by giving this supplemental instruction the trial judge constructively amended the indictment, Count II of which charged McCarthy and his codefendants with conspiracy to distribute cocaine *and* marijuana in violation of 21 U.S.C. § 846. He contends that his conviction should be reversed under the rule of *United States v. Stirone,* 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960).

In *Stirone,* the defendant was indicted under the Hobbs Act, 62 Stat. 793 (1948), for unlawfully interfering with interstate commerce, specifically the importation of sand into Pennsylvania. *Id.* at 213–14, 80 S.Ct. at 271. The trial judge instructed the jury, however, that the defendant could be convicted if the jury found that his activities had interfered with the exportation of steel from Pennsylvania. *Id.* at 214, 80 S.Ct. at 271. The defendant was convicted. The Supreme Court reversed the conviction, holding that the trial judge had improperly permitted the defendant to be convicted on a ground not charged by the grand jury. *Id.* at 218–19, 80 S.Ct. at 273–74. We have, of course, long recognized the validity of this rule. *See, e.g., United States v. Neff,* 525 F.2d 361, 363 (8th Cir. 1975).

The *Stirone* holding is not applicable, however, to the clarifying instruction given here by the trial judge. "Where a statute specifies two or more ways in which an offense may be committed \* \* \* all may be alleged in the conjunctive in one count of the indictment, and proof of any one of the acts conjunctively charged may establish guilt." *United States v. Mohr,* 728 F.2d 1132, 1135 (8th Cir.), *cert. denied,* 469 U.S. 843, 105 S.Ct. 148, 83 L.Ed.2d 87 (1984). "As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." *United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985). McCarthy was charged with conspiring to distribute cocaine and marijuana in violation of 21 U.S.C. § 846, which makes it unlawful to conspire to commit any offense defined in 21 U.S.C. chapter 13, subchapter 1. 21 U.S.C. § 841 makes it unlawful for any person to knowingly or intentionally distribute a controlled substance. Both cocaine and marijuana are, of course, controlled substances. 21 U.S.C. § 812.

Thus, Count II of the indictment alleges that McCarthy committed the same crime, conspiracy to distribute a controlled substance, in two ways. The trial judge did not err in instructing the jury in the disjunctive, in response to its request for clarification.[7] *Mohr,* 728 F.2d at 1135.

The clarifying instruction given by the trial judge is unlike the instruction given in *Stirone,* which permitted the jury to convict the defendant of an offense not fully contained in the indictment. *Stirone,* 361 U.S. at 218–19, 80 S.Ct. at 273–74; *see Miller,* 105 S.Ct. at 1816. Rather, by changing the language of the prior instruction from the conjunctive to the disjunctive, "what was removed from the case was in no way essential to the offense on which the jury convicted." *Miller,* 105 S.Ct. at 1820.

### VI.

■ McMahon argues that the prosecuting attorney misstated the evidence against McMahon in the government's summation and that the district court erred in failing to admonish the jury concerning this alleged misstatement. The statement McMahon contends was erroneous is quoted in McMahon's opening brief as follows: "Pat McMahon is another one that you can include among those that were a part of the five in which Amel Lueth acted as an organizer. He organized all those trips, and it was his money, and it was going to be his drugs that would be distributed by other members of his organization." He asserts that this misstatement could have led the jury to believe that McMahon organized trips to purchase drugs and directed other aspects of the Lueth organization. We reject this argument as meritless. We have carefully read the government's summation, and we conclude that the statement when placed in proper context[8] neither misstated the evidence nor was likely to confuse the jury as to the identity of "he." It was an obvious reference to Lueth.

We affirm the convictions of Amel Lueth, Susan Lueth, Patrick McMahon and Timothy McCarthy.[9]

■■■■■■■■■■■■■■■■■■■■

7. McCarthy also contends that the supplemental jury instruction "eroded the effectiveness" of his defense. The thrust of his complaint is that he structured his closing argument around the conjunctive language of Instruction No. 17 as given before closing arguments, and relied heavily on the lack of evidence linking McCarthy to the Lueth organization's distribution of cocaine. He does not contend that the supplemental instruction misstated the law, or was misleading to the jury. A jury's request for additional instructions is a matter addressed to the sound discretion of the trial judge. *United States v. Piatt,* 679 F.2d 1228, 1231 (8th Cir.1982). We do not believe that the district court abused its discretion in responding to the jury's request for clarification. Moreover, we have considered McCarthy's closing argument carefully, and al-

though it does make reference to the issue of whether McCarthy was involved in cocaine distribution as well as marijuana distribution, the bulk of the argument is concerned with the credibility of the government's witnesses.

8. The remark occurred during the government's discussion of the CCE count against Lueth. McMahon was mentioned as one of the individuals directed and controlled by Lueth.

9. Amel Lueth also contends that the trial court erred in refusing to grant his pretrial request for a continuance in order to secure different counsel. We have considered this argument, and reject it as being without merit.