Rickey HUGHEY *v.* STATE of Arkansas

CR 92-708            840 S.W.2d 183

Supreme Court of Arkansas
Opinion delivered November 2, 1992

*Keil & Goodson*, by: *John C. Goodson*, for appellant.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. Rickey Hughey appeals from a judgment of conviction for engaging in a continuing criminal enterprise in violation of Ark. Code Ann. § 5-64-414 (Supp. 1991). Hughey's conviction resulted in a sentence of thirty years in the Department of Correction.

Through the testimony of some twenty-seven witnesses the prosecution established that between August 1989 and July 1991 Hughey would procure crack cocaine in Dallas which at least six other individuals, acting under Hughey's direction, would process and sell in Columbia County, primarily from a house referred to as "in the hole," generating substantial income. This conduct was alleged to violate Ark. Code Ann § 5-64-414 (Supp. 1991).

Our statute is patterned closely after the federal statute, 21 U.S.C. 848 (Supp. 1992) and requires five elements of proof. The first element involves the commission by the defendant of a felony under the Controlled Substances Act. The second is that such felony must be part of continuing series of two or more drug felonies under the act. Third, the enterprise must be undertaken by the defendant in concert with five or more persons. Fourth, the defendant must have been the organizer, or supervisor or manager, and, fifth, have realized substantial income or resources from the enterprise.

The second element includes a requirement that the course of illicit conduct span a definite period of time and a "series" is established by proof of three or more related violations. *United States* v. *Jones*, 801 F.2d 304 (8th Cir. 1986). Under the

wording of our statute element two is met if there are two felonies under the act in addition to the felony committed by the defendant. The third and fourth elements are discussed in *United States* v. *Moya-Gomez*, 806 F.2d 706 (7th Cir. 1988):

> The basic outlines of the disputed management element [of the CCE statute] have been liberally construed. *United States* v. *Possick*, 894 F.2d 332, 335 (8th cir. 1988). "The statute is written in the disjunctive language, and the government need prove only that the defendant was an organizer, or a supervisor, or held some management role, not all three." *Id.* Furthermore, the terms organizer, supervisor, or manager are to be given their ordinary meaning, *United States* v. *Wilkinson*, 754 F.2d 1427, 1431 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); and it is irrelevant that other persons may have exercised supervision superior to the defendant's, *United States* v. *Becton*, 751 F.2d 250, 254-55 (8th Cir. 1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985). *See also United States*, v. *Maull*, 806 F.2d 1340, 1343 (8th Cir. 1986), *cert. denied*, 480 U.S. 907, 107 S.Ct. 1352, 94 L.Ed.2d 522 (1987); *United States* v. *Losado*, 674 F.2d 167, 174 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). The Eighth Circuit has summarized nicely the nature of the government's burden of proof on this question:

> > The government need not establish that the defendant managed five people at once, that the five acted in concert with each other, that the defendant exercised the same kind of control over each of the five, or even that the defendant had personal contact with each of the five. *In essence, the management element is established by demonstrating that the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instruction, or terms.*

*Possick*, 849 F.2d at 335-36 (emphasis supplied) (citations omitted); *see also United States* v. *Lueth*, 807 F.2d 719, 731-32 (8th cir. 1986); *United Stated* v. *Cruz*, 785 F.2d 399, 407 (2nd

Cir. 1986); *Becton,* 751 F.2d at 254-55.

Nor is it necessary that the five individuals working under the defendant must be involved directly in drug sales. *See United States* v. *Jones, supra; United States* v. *Moya-Gomez, supra.* Nor is it necessary that the five act in concert at the same time or that the role of each to the defendant be identical. *United States* v. *Jenkins,* 904 F.2d 549 (10th Cir. 1990); *United States* v. *Phillips,* 664 F.2d 971 (5th Cir. 1981).·

■ Two circuits have rejected arguments that the fifth element requires proof of substantial *net* income. In *United States* v. *Jeffers,* 532 F.2d 1101 (7th Cir. 1976), the court wrote:

> The statute provides that a person only engages in a continuing criminal enterprise when, in conjunction with meeting all the other requirements, he "obtains substantial income or resources" from the enterprise. 21 U.S.C. § 848(b)(2)(B). Nothing else in the statute provides aid in determining how "substantial income" should be characterized, whether it should be "net" or "gross." Nor does the Committee Report on the Act provide assistance. The only passage in the report which deviates from the statutory language in question speaks of "substantial profits" rather than "substantial income." H.R.Rep.No. 1444, 91st Cong., 2nd Sess. (1970) (to accompany H.R. 18583), 1970 U.S. Code Cong. & Admin. News pp. 4566, 4575.

In *United States* v. *Manfredi,* 488 F.2d 588 (2d Cir. 1973), the court observed that the federal statute was aimed at those who trafficked in heroin where "substantial sums of money chang[ed] hands."

## I.

■ We first address Hughey's second point of error, a challenge to the sufficiency of the evidence. *See Harris* v. *State,* 284 Ark. 247, 681 S.W.2d 334 (1984). The thrust of the argument is that the prosecution of Hughey was built on the testimony of Curtis "Petey" Cole. Cole was a cousin of Hughey and undeniably an accessory in any criminal enterprise pertinent to the charge against Hughey. Cole's testimony included assertions that he rented "in the hole" for Hughey with money Hughey gave him; that "on many, many occasions" he sold cocaine for

Hughey; that he accompanied Hughey to Dallas three times to obtain cocaine (though he did not actually witness the transactions); that he would be given cocaine in bulk which he would reduce to rocks with a razor blade; that he sold rocks for $20 each, $15 of which he would give to Hughey. Cole could give no information as to volume or total sales, but he gave Hugehy money every two or three days; the most he would make in a week of sales would be $400 to $500, $250 to $300 of which would go to Hughey. Cole stated specifically that he worked "for Rickey," that he was mostly "over" the others, whom he identified as Eric Garnett, Donald Fears, Sammy Samful, Chris Manning and Clifton Hughey.

Hughey argues that under Ark. Code Ann. § 16-89-111(e)(2) (1987) a felony conviction cannot be held upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense. Furthermore, when Cole's testimony is excluded in accordance with the test mentioned, for example, in *Henderson* v. *State*, 279 Ark. 435, 652 S.W.2d 16 (1983), "there is virtually no evidence of an enterprise of any kind." We reject the argument because we find ample corroboration of Cole's testimony elsewhere clearly connecting Hughey to the ongoing enterprise.

Jerry Rose testified that, working with an undercover officer, he purchased two $20 rocks of cocaine at "in the hole" from Eric Garnett. He said Eric, Rickey Hughey and Petey Cole were in front of the house when he came up and Rickey asked Eric if he knew Rose. Eric said that he had seen Rose before. Rose asked Eric if he "had anything" and with that Eric and Rose went inside the house where the purchases were completed.

Officer Randy Nixon testified about a traffic stop of Rickey Hughey near Texarkana. Hughey was driving eastward in a rented car. Under the passenger's seat Nixon found a plastic sack containing matter which was subsequently identified as cocaine.

Officer Dexter Turner testified that on January 7, 1991, incognito he purchased six bags of marijuana and two rocks of crack cocaine from Petey Cole at "in the hole" at a price of $100.

Tracey Webb testified that he bought five rocks of crack cocaine from Rickey Hughey at "in the hole." He paid Hughey

$100. He testified he had bought cocaine previously at the same place.

Cora Mae Chambers, Petey Cole's girlfriend and owner of the property, admitted, albeit reluctantly, that Rickey Hughey was at the place when cocaine was being sold, adding, "But it don't mean it's his." Asked whether she had previously told the police it was Rickey Hughey who brought the cocaine to the house, she said she could not recall.

Donald Fears denied any knowledge of cocaine sales at "in the hole," but admitted he was a lookout. Pressed further, he testified he was working for Rickey, "looking out for the cops."

Officer Scott Lee testified that he made a traffic stop of a vehicle occupied by Rickey Hughey, Clifton Hughey and Jennie Biddle, Rickey Hughey's girlfriend and mother of his infant son, Rickey, Jr. A search of Ms. Biddle's purse produced a weapon and $2,900 in cash consisting of eighteen $100 bills and eighty $20 bills, which Ms. Biddle said belonged to Rickey Hughey. Hughey had five $100 bills. During the search a dog trained in drug detection was brought and made "a hit on the purse," indicating the money had been in close proximity to drugs.

Clifton Hughey, though denying at one point that Petey Cole sold drugs for Rickey Hughey, did admit that Cole worked for Rickey Hughey and that Rickey was "running the place." He gave the following testimony:

> Q: Did you say to Mr. Young: "So, in other words, you're saying that the drugs that Petey was selling, they wasn't Petey's drugs, he was selling it for Rickey?" And did you say this: "It had to of been cause Rickey was the one who came around here to get Petey and they'd leave and meet down there at the place. When the people came around that don't want the food I tell 'em, 'Man, they gone somewhere, I don't know where they at.' They would leave me down there. I would stay down there, you know, all day long just about. I never did stay all night there, I stayed at home with my mom and my sister." Did you say that?
>
> A: Yes, sir.
>
> Q. All right. Why did you say that?

A. Cause it was the truth.

Q. Okay. But, the question was: "So, in other words, you're saying that the drugs Petey was selling, they wasn't Petey's drugs, he was selling it for Rickey," and you said: "It had to of been." Is that the truth.

A: But, I can't prove that, though.

Q: Okay. Did you ever hear there was drugs being sold down there at this place?

A: Yeah, I heard it.

■ On the latter element of substantial income, the state's proof was not insufficient. Hughey had no visible means of support during most, perhaps all, of the period in question, yet he was shown to have had large amounts of cash in denominations of $100, $20, $10 and $5's. The $3,400 uncovered by the traffic stop was in $100 and $20 bills. A bank employee testified to deposits to Hughey's account, always in cash, of sizeable sums: $1,000 on February 4, 1991, $1,500 on January 28, 1991, $1,130 on April 15, $1,800 on May 28 and $2,000 on April 22. The witness personally handled two of those transactions and testified the deposits were in small increments—$5's, $10's and $20's and the two transactions were unusual enough that she reported them to her supervisor. Hughey was shown to have owned three late model vehicles and had paid between $1,300 and $1,600 in cash for a stereo system in one. He paid $1,181.09 in cash in $100 bills for tires and wheels for one of the vehicles. There was testimony that he purchased a ring for Sharon Hughey costing $895 and had an account at Peoples Bank of Waldo with a balance of $1,746.10. Sharon Hughey, Rickey Hughey's estranged wife, testified that Rickey Hughey gave her $1,500 for the down payment on a 1989 Escort, one of the three vehicles mentioned earlier. There was proof that during a six month interval Hughey paid $3,240 in insurance premiums, using cash. Jennie Biddle testified to having deposited $1,500 from Hughey in a savings account in the name of Rickey Hughey and Rickey Hughey, Jr.

There were other circumstances in evidence which gave color in greater or lesser degrees to the testimony of Curtis Cole regarding the enterprise. It would serve no useful purpose ·to furhter detail the proof, as the excerpts already provided are more

than enough.

## II

A roster of the state's witnesses included several of those allegedly involved in the enterprise. Some were openly antagonistic and the state on occasion sought and obtained permission to question them as hostile witnesses, using prior statements to police to impeach the credibility of their in-court responses. Hughey contends the state's impeachment of its own witnesses by the use of prior inconsistent statements was improper and resulted in the jury's giving substantive effect to such statements.

Hughey names Eric Garnett, Cora Mae Chambers, and Donald Fears, as those whose testimony was affected by this ruling but his brief gives little help in differentiating between the substantive testimony of these witnesses and evidence that the trial court allowed only for impeachment purposes. And while we will not go to the record to sustain an assertion of error, we will endeavor to address the point but we find no merit in the argument.

The credibility of a witness may be attacked by any party, including the party calling the witness. Ark. R. Evid. 607. One method of impeachment of a witness is the use of prior statement inconsistent with testimony at trial. Ark. R. Evid 613.

Considerable discretion necessarily rests with the trial court in determining where the line is drawn in the impeachment of a hostile witness and those rulings are reviewed from the aspect of an abuse of discretion. In obvious cases, as in *Roberts* v. *State*, 278 Ark. 550, 648 S.W.2d 44 (1983), on which Hughey relies, reversal may result. But this case is not the counterpart of the *Roberts* case. In *Roberts*, there was a single crime and a single witness—a child who witnessed an encounter between his parents resulting in his mother's death. In a statement to the police shortly after the incident the child implicated his father. Later he recanted and the prosecution was aware when it called the child as a witness that he had repudiated his earlier account. There is no indication in this case that the prosecution was informed on that score and it had a right to assume the witnesses would testify in accordance with the statements they had given. Nor do we find in the abstracted record that the entire statements of these witnesses

were introduced, as occurred in *Roberts*.

Additionally, each of the three gave substantive testimony material to the prosecution. Cora Mae Chambers admitted having seen rock cocaine packed in foil; David Fears admitted having served as a lookout and Eric Garnett admitted having accompanied Hughey on one trip to Dallas.

■ Finally, the court admonished the jury it could consider the previous statements only for purposes of impeachment and we assume the jurors heeded that admonition.

■ Hughey's two remaining points can be more readily disposed of. During the testimony of Officer Nixon he referred to several forms of a car rental agency which appeared to be issued to Rickey Hughey and purportedly signed by him. When the state offered the forms in evidence to show frequent use of rental vehicles counsel objected on grounds of relevance and an inadequate foundation. On appeal, Hughey argues the evidence should have been excluded as hearsay. That argument is raised for the first time on appeal.

■ Lastly, Hughey complains that the trial court erred in admitting evidence of other crimes and bad acts in violation of A.R.E. Rule 404(b). Hughey points to the two traffic stops included in the testimony of officers Lee and Nixon. In one, Ms. Biddle and Hughey were carrying $3,400 in cash and a drug detecting dog made a "hit" on Ms. Biddle's purse. In the other, crack cocaine was discovered in the vehicle occupied by Hughey and Eric Garnett. Hughey argues that the charges based on the possession of cocaine had not as yet gone to trial and were therefore inadmissible, that the prejudice accompanying both episodes outweighed any probative value. The trial court overruled the objections and permitted the testimony to show concerted actions, or conspiracy, and to show substantial income was being generated by the enterprise. These rulings were correct. This evidence was relevant as to time, place and type of the activity where a continuing marketing of drugs is the issue. Obviously, where the state is proceeding under Ark. Code Ann. § 5-64-414 (Supp. 1991), the parameters of relevant proof are wider. That is not to say that Rule 404(b) is vitiated in continuing criminal enterprise cases, but if the evidence is germane to any of the five elements of proof, its relevance is a matter for the

discretion of the trial court. That discretion was not abused in these rulings.

Affirmed.