

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CR-15-577

| | |
|---|---|
| | **Opinion Delivered** April 26, 2017 |
| MICHAEL HUNTER<br>APPELLANT | APPEAL FROM THE COLUMBIA COUNTY CIRCUIT COURT<br>[NO. 14 CR-13-60] |
| V. | |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE DAVID W. TALLEY, JR., JUDGE |
| | AFFIRMED AS MODIFIED; REMANDED TO CORRECT THE SENTENCING ORDER |

## BRANDON J. HARRISON, Judge

In 2013 the State charged Hunter with one count of engaging in a continuing criminal enterprise. Specifically, it alleged that Hunter had "violated a felony provision of the Uniform Controlled Substance Act, namely, the Delivery of a Controlled Substance-Cocaine and Methamphetamine." The State claimed that the violation was part of a continuing series of two or more felony offenses: delivery of cocaine and delivery of methamphetamine. It further alleged that Hunter acted in concert with five or more people when he committed "these violations" and that Hunter received substantial income from the operation. The conduct was alleged to have occurred between 2006 and 2013. The State later amended its criminal information to include a habitual-offender enhancement, Ark. Code Ann. § 5-4-501(a)(1) (Supp. 2007).

The case went to a bench trial on 8 April 2014 before the Columbia County Circuit Court, and a sentencing order was entered on 28 April 2015. The sentencing order reflects that the circuit court convicted Hunter of one count of engaging in a continuing criminal enterprise and sentenced him to 70 years' imprisonment in the Arkansas Department of Correction and an additional 10 years' suspended imposition of sentence (SIS) for that count. Hunter appeals the April 2015 sentencing order and the related conditions of the SIS.

## I. *The Evidence Against Hunter*

We first address Hunter's challenge to the sufficiency of the evidence. He argues that the State did not prove every element of Arkansas's continuing-criminal-enterprise statute beyond a reasonable doubt and goes through each of the twenty-one trial witnesses' testimony. The standard of review for whether the verdict is based on sufficient evidence is whether, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the State proved the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979). Direct or circumstantial evidence may provide substantial evidence to support a verdict. *Campbell v. State*, 2009 Ark. 540, 354 S.W.3d 41. Substantial evidence is that evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.* Circumstantial evidence alone may constitute substantial evidence. *Lindsey v. State*, 68 Ark. App. 70, 3 S.W.3d 346 (1999). When circumstantial evidence alone is relied upon to support a conviction, it must indicate the accused's guilt and exclude every other reasonable hypothesis. *Id.* Only when



circumstantial evidence requires the fact-finder to speculate and conjecture is it insufficient as a matter of law.  *Hutcherson v. State*, 34 Ark. App. 113, 806 S.W.2d 29 (1991).

### A.  The Primary Felony Offense

Arkansas Code Annotated section 5–64–405 (Supp. 2013), which is the continuing-criminal-enterprise statute, provides that

> (a) A person commits the offense of engaging in a continuing criminal enterprise if he or she:
>
>> (1) Violates any provision of this chapter that is a felony, except §§ 5–64–419 and 5–64–441; and
>>
>> (2) The violation is a part of a continuing series of two (2) or more felony offenses of this chapter, except §§ 5–64–419 and 5–64–441:
>>
>>> (A) That are undertaken by that person in concert with five (5) or more other persons with respect to whom that person occupies a position of organizer, a supervisory position, or any other position of management; and
>>>
>>> (B) From which that person obtained substantial income or resources.

Because no exception applies in this case, the first element the State must prove under Ark. Code Ann. § 5–64–405 is that Hunter committed a felony under the Controlled Substances Act.  *See Hughey v. State*, 310 Ark. 721, 723, 840 S.W.2d 183, 184 (1992).  We call this the "primary felony offense."  And we infer from the record as a whole that the primary offense occurred when Hunter delivered 0.8048 grams of methamphetamine to Rachel Cole in 2007.  (We must infer this because the State does not pointedly identify the primary offense for statutory-analysis purposes.)

The State says it proved that Hunter was "engaged in at least two instances of the Class Y felony delivery of controlled substance, one Class C felony delivery of a controlled substance, one Class C felony delivery of a counterfeit substance, and multiple counts of operating a drug premises." Failing to identify a primary felony offense, the State says only that the evidence showed that Hunter "committed the requisite underlying felonies and these felonies were, no doubt, part of a series of a CCE." For due-process reasons, we reject the State's use of underlying offenses (against Hunter) that were not named in the criminal information. We also remind the State that a prosecutor's closing arguments should not be cited as substantial evidence supporting Hunter's conviction. Lawyers' arguments are not evidence. *Ligon v. Stilley*, 2010 Ark. 418, 371 S.W.3d 615.

Moving on . . . Hunter argued in his motions to dismiss, as he does here, that "at most" the State proved that he introduced callers to the person who eventually sold drugs and that there is no credible evidence that he delivered methamphetamine—only that he "may have possessed" it. Simply possessing a controlled substance is not a qualifying offense under the continuing-criminal-enterprise statute. *See* Ark. Code Ann. § 5–64–405 and –419.

1. *The trial testimony*

The court's review of the record shows the following. Rachel Cole testified at trial as a State's witness. She said that she worked with law-enforcement officer Michael Caldwell in 2007 and that she twice tried to buy drugs from Hunter. The first time she called Michael Hunter he told her to go to the Ponderosa, a trailer house that Hunter used.

There, she bought drugs from Derek Hunter, the defendant's brother,[1] using money that Officers Wilson and Caldwell provided. Cole explained that she had known Michael Hunter all her life, recognized his voice on the telephone, and that during their telephone conversation she and Michael had discussed the price of drugs and what she wanted. She further explained that she gave Derek Hunter $100 at the Ponderosa and that he handed her a rock-like substance, which she later gave to Officer Caldwell. Cole also testified about another time she called Michael Hunter, and he told her to go to a trap house on Dempsey; there she bought drugs from Cadetric Box. During the course of the direct examination, the State stipulated that Cole didn't "know what she bought. She's not a chemist."

On cross-examination, Cole said that these purchases occurred in September 2007 and that she had started working with Officers Caldwell and Wilson in exchange for the dismissal of an aggravated-robbery charge. She clarified that when she talked to Michael Hunter she told him that she wanted to buy some crack cocaine and that "he told me to meet him at the Ponderosa." When asked if Michael Hunter sold her any drugs, she said "No." Cole explained that the transaction was recorded because she was wearing a wire. No recording was introduced as evidence.[2]

Officer Michael Caldwell testified that he had worked narcotics for the Magnolia Police Department since 2007, that he was also currently assigned to an FBI task force, and

---

[1]Other witnesses identified Derek as Michael Hunter's mother's boyfriend. So it seems there are two Dereks in this case: Derek Hunter and Derek Coleman.

[2]A bench conference was held where the court ruled that the missing-recording issue was "moot" after hearing arguments that the recording had been lost or destroyed.

that he was an agent with the Drug Task Force. Officer Caldwell stated, in part, that the Ponderosa was located at 131 Columbia 56 and that it was a "location where Michael Hunter and other individuals dealt drugs." His conclusion was based on police interviews of numerous people. He explained that he and Officer Robert Wilson met with Rachel Cole on 19 September 2007. They told Cole to go straight to the Ponderosa and come back to a prearranged location. Officer Caldwell said they provided buy money to Cole. Cole returned to the prearranged location and gave the officers "the suspected methamphetamines." Officer Caldwell explained that the suspected meth was delivered to the Arkansas State Crime Lab and identified State's Exhibit 13 as the lab-submission report he had signed. He connected State's Exhibit 13 with State's Exhibit 14—the latter exhibit being the crime-lab report showing that suspected methamphetamine submitted was in fact 0.8048 grams of methamphetamine dimethyl sulfone. Hunter expressly waived on the record any right he may have had that a "crime lab person" testify during trial and agreed to the crime-lab report being admitted as evidence against him. Officer Caldwell testified that he did not arrest Hunter in 2007, but continued to surveil him for the next six to seven years. According to Officer Caldwell, Michael Hunter's usual mode of operation was to use a third party to deliver the drugs.

The Chief of Police of Waldo, Arkansas, Robert Philson, testified that he knew Hunter personally and spoke with Hunter on 28 March 2010 and asked him about some arrests that had been made the day before. During the conversation, Philson said that Hunter admitted that he sold drugs to take care of his family and "put some women on the

side and pay bills" and that he was arrested with "large sums" of cash in Greenville, Texas, as he was journeying to buy drugs in Dallas.

FBI Special Agent Forrest Avery Benham testified that he talked to Hunter after a search warrant had been executed in March 2013 at Hunter's residence in Waldo, Arkansas. Hunter told Agent Benham that he would obtain approximately one-half to one ounce of methamphetamine weekly from a family member who was a supplier and that "he did not feel comfortable trafficking in narcotics with just anyone." Based on his conversation with Hunter, Agent Benham estimated Hunter had been earning about $250 per week for the past three years from selling a one-half ounce of meth. Hunter indicated that, before that three-year period, he had obtained narcotics from a man in Dallas, Texas. Agent Benham testified that Hunter showed him where the drugs he sold were hidden at the house on 205 Angela.

On cross-examination, Agent Benham said Hunter had indicated that he received between thirteen and twenty-seven grams of methamphetamine a week and that Agent Benham considered that a "fair amount of narcotics" for Waldo, Arkansas, although Hunter indicated to Agent Benham that he was "just trying to get by and that he had financial challenges." On redirect examination, Agent Benham said he estimated Hunter had earned a total of $39,000 in tax-free income over the past three years.

Another witness for the State, Barry Poindexter, testified that he met Hunter at a John Deere dealership in Magnolia, Arkansas around the end of 2004 or 2005. He explained that he developed a business relationship with Hunter by buying methamphetamine from him and then reselling it. He started off with small amounts, and as time went by, worked

up to a quarter ounce (seven grams). Poindexter testified that between 2007 and 2012 he bought drugs from, or was given drugs by, Hunter more than twenty times. He said that these buys took place "everywhere," including the Ponderosa. Poindexter explained, in part, that the Ponderosa was a trailer house that Hunter owned. He also said that whenever a drug transaction occurred, wherever it was, it would begin with a call to Hunter, although it was not always to the same telephone number. He said that he had dealt with twenty to thirty different individuals, but mainly with Derek Coleman and Ricky Biddle, following a telephone call to Hunter inquiring about drugs. He said that when he would call Hunter, Hunter would tell him to call another number and that other number "was him [meaning Hunter.]" They would talk "business and prices" and Hunter would tell Poindexter where to wait, and "they would bring me the drugs." He confirmed that he was "recruited to be a drug dealer for D.D. Hunter."[3]

### 2. *The testimony and the continuing-criminal-enterprise statute*

The statute in force in 2007 when the methamphetamine delivery to Cole was alleged to have occurred provided that the State must prove that Hunter knowingly or purposely delivered methamphetamine. Ark. Code Ann. § 5–64–401 (Supp. 2007). "Deliver" or "delivery" means the "actual, constructive, or attempted transfer from one (1) person to another of a controlled substance or counterfeit substance in exchange for money or anything of value, whether or not there is an agency relationship." Ark. Code Ann. §

---

[3]Several witnesses said Hunter is also known as D.D.

5-64-101(6). Delivery of less than 28 grams of methamphetamine was classified as a Class Y felony for "any purpose other than disposition." Ark. Code Ann. § 5-64-401(a)(1)(A)(i).

As we said earlier, Hunter argues that he did not deliver the drugs. But the circuit court, sitting as the fact-finder, could have reasonably found that Hunter constructively transferred methamphetamine to Cole. Although Hunter did not meet Cole when delivering the drugs—nor was he physically present when the meth was transferred—he did participate in the drug transaction by arranging the price and the location for Cole to buy methamphetamine. Cole arrived at the Ponderosa, a known drug location, and received drugs from Derek at the price and location Hunter had prearranged. This circumstantial evidence, combined with Hunter's admission to law-enforcement agents that he was a drug dealer, and Poindexter's testimony about the Ponderosa and Hunter's method of operation, is substantial evidence that Hunter constructively delivered methamphetamine to Cole on 19 September 2007.

B. Continuing Series of Two or More Felony Controlled Substance Offenses

The second element of the continuing-criminal-enterprise statute the State must prove is that the course of illicit conduct spanned a definite period of time; and a "series" is established by proof of three or more related violations. *Hughey*, 310 Ark. at 723–24, 840 S.W.2d at 184 (internal citation omitted). The Arkansas Supreme Court has said that "[u]nder the wording of our statute element two is met if there are two felonies under the act in addition to the felony committed by the defendant." *Id.* So the State had to prove that the primary offense was part of a continuing series of two or more other felony-drug offenses. Again, Hunter's sole argument on this element is that the State failed to prove that

he delivered methamphetamine. We hold that there was sufficient proof that Hunter constructively delivered methamphetamine to Anna Estes in 2009 and Donnell Burnell in 2011.

### 1. *Delivery to Anna Estes*

Anna Estes testified that she was an unwilling witness for the State. The caveat having been spoken, she then told the court that she went to the Ponderosa numerous times to buy drugs from either Hunter or through one of his associates. She also said that she had a sexual relationship with Hunter and was herself a drug addict. According to Estes, she would text Hunter, he would tell her where to go, and someone would deliver drugs to her car. Estes said that she went to the Ponderosa "a lot" between 2007 and 2009 to buy drugs.

On 6 October 2009, Estes was "busted" by Officer Caldwell. She reportedly told Caldwell that she got the drugs from D.D. in Waldo and was delivering them to a friend, Greg Fuller. Estes explained that she was selling drugs at the time to support her habit and that she would hold the drugs for 3–4 days before she sold them. Although she was arrested for selling methamphetamine, Estes received a "break" with a reduced charge and addiction treatment.

On cross-examination, Estes explained that the break she received from the prosecuting attorney did not include testifying against Michael Hunter. When she was arrested by Officer Caldwell, Estes was also selling ecstasy pills, though she had bought them from someone other than Hunter. Estes clarified that she was arrested in October 2009 but did not make a deal with the prosecuting attorney until 23 June 2011, which included nolle prossed charges. Estes told the court that when she purchased drugs from Hunter, "they

took place anywhere," including a hamburger place or in the middle of the street in Waldo. Prior to the transactions, Estes would communicate through text messaging with a person she thought to be Hunter, though she was not certain it was him. Hunter never appeared at any of the drug transactions, according to Estes, and he never personally handed her drugs. She also denied that Hunter sent her to a location to buy drugs.

On redirect examination, Estes explained that Hunter provided her with a number to call or text for drugs and that he would text her a new number when he changed phones. On recross, she stated that she did not know for sure who gave her the phone number that she testified Michael Hunter had given her. But on redirect she said that she had no reason to believe it was anyone other than Hunter.

Officer Caldwell testified that Hunter used tracphones and that he used other people's phones in the course of his drug dealing. Officer Caldwell stated that law enforcement identified one phone that was actually registered to Hunter. He explained that on 6 October 2009 he came into contact with a man named Greg Fuller during a search of a residence in Magnolia, Arkansas. Fuller had a phone and was in the process of arranging a purchase of methamphetamine and ecstasy from Anna Estes. Officer Caldwell assumed Fuller's identity and exchanged texts with Estes wherein she agreed to deliver ecstasy and methamphetamine to a certain location. Officer Caldwell surveilled the area and when Estes arrived, he arrested her.

According to Officer Caldwell, Estes told him that she had gotten the methamphetamine from Michael Hunter and the ecstasy from another individual. Caldwell then placed the recovered substances into evidence and submitted it to the Arkansas State

SLIP OPINION

Crime Lab. He testified that State's Exhibit 11 is a lab-submission sheet that is consistent with the numbers that go with the laboratory report that is State's Exhibit 12. State's Exhibit 12 shows that one of the substances recovered was 1.4142 grams of methamphetamine and the other substance was four pills of benzylpiperazine (BZP). Anna Estes is listed as the suspect on the report.

When Hunter allegedly delivered the meth to Estes in October 2009, the State had to prove that Hunter knowingly or purposely delivered the methamphetamine. Ark. Code Ann. § 5-64-401 (Supp. 2009). "Deliver" or "delivery" means the actual, constructive, or attempted transfer from one (1) person to another of a controlled substance or counterfeit substance in exchange for money or anything of value, whether or not there is an agency relationship. Ark. Code Ann. § 5-64-101(6).

The State put on sufficient proof that Hunter constructively delivered methamphetamine to Estes. In addition to his admissions to law-enforcement agents about being a drug dealer that we have already recited, the circuit court heard that Estes frequently went to the Ponderosa (and other locations) to buy drugs as directed by Hunter to buy drugs. It was up to the circuit court to credit Estes's testimony as it saw fit to do. While circumstantial, there was sufficient proof that it was Hunter who constructively transferred methamphetamine to Estes; and Estes, in turn, attempted to resell the meth to Greg Fuller but was instead arrested by Officer Caldwell, who recovered the methamphetamine. We reject Hunter's argument that he cannot be guilty of delivering methamphetamine to Estes because he did not physically deliver the drugs.

2. *Delivery to Donnell Burnell*

Donnell Burnell, a felon, testified for the State that he agreed to make buys for Agent Crawford of the Drug Task Force. He recalled some work involving Michael Hunter, whom Burnell calls D.D. He testified that he knew Hunter's voice on the phone and had known Hunter for years. Burnell called Hunter, and Hunter told him to meet him at the Lee Biddle Trailer Park. Burnell explained that Cory Briggs had given him Hunter's number and that the call was about buying some hard meth or "ice." When Burnell arrived at the Lee Biddle Trailer Park, he saw Hunter there but did not speak with him. Corey Briggs handed Burnell "ice," and Burnell handed Briggs $305 that Officer Crawford had given him.

On cross-examination, Burnell said that the entire conversation he had with Hunter on the phone was recorded. Burnell later explained that the first telephone call he made to Hunter requesting "ice" was not recorded, but a second call was.

Detective Shawn Crawford testified that he recruited Burnell to assist him in the Hunter investigation. Detective Crawford explained that Burnell was "into some trouble" himself for delivering controlled substances. Crawford said that one phone call Burnell made was not recorded. Burnell was furnished with electronic-surveillance equipment and $325 of buy money from the sheriff's buy fund and sent "on his way."

After Burnell bought the drugs, he met Detective Crawford at a prearranged location and returned the recording equipment and suspected narcotics. Detective Crawford placed the drugs Burnell gave him in an evidence bag and sealed it. The crime-lab submission sheet for that evidence bag, which Detective Crawford signed, was admitted as State's

Exhibit 2, without objection. The offense date is listed as 08/17/2011 and the suspect's name is listed as Corey Briggs. State's Exhibit 7, a crime-lab report, was introduced without any testimony about it and without objection. State's Exhibit 7 has the same case numbers and offense date (08/17/2011) as State's Exhibit 2 and reflects that the substance was 3.2348 grams of dimethyl sulfone methamphetamine.

Officer Caldwell testified that he had listened to an audio tape of Donnell Burnell and believed the voices on the tape to be Burnell's and Michael Hunter's. State's Exhibit 5 is a recorded call made on 17 August 2011. The recording begins with "[a]pproximate time is 5:54. Sergeant Michael Caldwell with Detective Shawn Crawford. The C.I. [Burnell] is about to make a phone call to D.D." The call is essentially about Hunter directing Burnell on how to get to Lee Biddle Trailer Park. There is no mention of drugs.

State's Exhibit 6 is the August 17 video recording. It captured a conversation between Burnell and Corey Briggs about money and driving past the trailer park. A conversation between Burnell and Sergeant Caldwell and Detective Crawford follows. Burnell says that D.D. "won't come out that trailer" and that "he sent Corey to handle it man." The officers confirmed on the recording that D.D. (Hunter) arranged for the drugs to be delivered to Burnell by Corey Briggs and that he was present at the trailer.

Here, Hunter again argues that he did not deliver methamphetamine to Burnell. Under the statute in place when Hunter allegedly delivered drugs to Burnell, a person who delivers two grams (2g) or more but less than ten grams (10g) by aggregate weight, including an adulterant or diluent, of methamphetamine or cocaine upon conviction is guilty of a Class B felony. Ark. Code Ann. § 5-64-422 (Supp. 2011). The definition of delivery

remains unchanged: "Deliver" or "delivery" means the actual, constructive, or attempted transfer from one (1) person to another of a controlled substance or counterfeit substance in exchange for money or anything of value, whether or not there is an agency relationship. Ark. Code Ann. § 5-64-101(6).

We hold there was sufficient evidence that Hunter constructively delivered methamphetamine to Burnell in August 2011. There was evidence that Burnell called Hunter, and Hunter negotiated the price and location. Burnell showed up at the location (Lee Biddle Trailer Park). Corey Briggs then exchanged methamphetamine for $305 from the sheriff's buy fund. These facts, combined with the testimony and other admissions we have discussed earlier, is substantial evidence of a constructive delivery of methamphetamine from Hunter to Burnell, through Corey Briggs.

We therefore affirm on the "second element" of the offense under *Hughey*—that the State sustained its burden of proving a continuing series of two or more felony controlled-substance offenses when it proved that Hunter, at a minimum, constructively delivered methamphetamine to Anna Estes and Donnell Burnell. [4]

C. Organizer, Supervisor, or Some Management Role

The State must also prove Hunter donned the role of organizer, supervisor, or some managerial position in the criminal enterprise and did so in concert with at least five

---

[4]We do not discuss the timing of the deliveries, how the deliveries relate to one another, and whether they meet the test of being a "continuing series." Hunter argued the topic below, but he abandoned it on appeal. The sole argument on this element is that the State failed to prove that he delivered a controlled substance.

additional people. Ark. Code Ann. § 5-64-405(2)(A). On appeal, Hunter argues, as he did in his motion to dismiss at the close of all the evidence that,

> [e]xcluding the law enforcement officers, the State paraded a veritable rogue's gallery of sorry characters before the trial court. Nearly all of them testified only because the State forced them to do so; nearly all of them are drug addicts, convicted felons, or both; and none of them offered any credible evidence that . . . any of the persons from whom they purchased drugs acted in concert with, or under the direction or influence of Mr. Hunter.

In *Leavy v. State*, the supreme court summarized the management provisions of the continuing-criminal-enterprise statute this way:

> The government need not establish that the defendant managed five people at once, that the five acted in concert with each other, that the defendant exercised the same kind of control over each of the five, or even that the defendant had personal contact with each of the five. In essence the management element is established by demonstrating that the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions or instruction.

*Leavy v. State*, 314 Ark. 231, 237, 862 S.W.2d 832, 834 (1993) (internal citation omitted).

### 1. *More evidence on Hunter as CEO*

In addition to the testimony we have recited already, more trial testimony is relevant to this leadership element. Officer Todd Dew of the Magnolia Police Department testified that he was present when a search warrant was executed on 21 March 2013 at Hunter's residence. He explained that he found a total of $1,860 in Hunter's pants and wallet. Harry Washington of the Hunt County Sheriff's Office in Texas testified that he encountered Hunter as a passenger during a traffic stop on I-30 in April 2011. Hunter had $5,600 in his tennis shoe. On 2 June 2011, Officer Washington encountered Hunter again while conducting consensual searches on a Greyhound bus. Hunter was carrying $10,984 in his crotch area and that money was seized by the State of Texas.

16

Ashley Ellis testified that she called Hunter in 2011 and told him that she wanted some methamphetamine and met him at the Ponderosa. When she arrived, Michael Hunter left the Ponderosa, and Derek Hunter came in and "gave [her] the dope."

Saquita Easter, one of Hunter's girlfriends, testified that Hunter took her to hotels and on trips to Dallas where they stayed and shopped, that Hunter drove a Suburban with rims, and that $20,000 to $30,000 in cash was hidden in the vehicle. Easter said that Hunter would give the cash to a man named Claudie Miller when they got to Dallas. Special Agent Forrest Avery Benham testified that he knew about Claudie Miller's case and that Miller had been indicted by the U.S. Attorney's Office and convicted of narcotics trafficking.

Easter also testified that the Ponderosa was where most of the drug transactions took place. She said that Derek[5] "basically pretty much brought D.D. the money back" during the drug transactions. She confirmed that John Armstrong would do the same thing—"[h]e had took something down the road and pretty much just threw it out the window" and would bring back money to Michael Hunter. Ditto for Dexter Greene. On cross-examination, Easter confirmed that Hunter would give drugs to Armstrong to deliver and Armstrong would return with money. The "same thing" would happened with Mr. Coleman and Mr. Green. She confirmed that she only saw this happen with those three people.

---

[5]It is unclear during this direct examination which Derek—Derek Hunter or Derek Coleman—Easter is referring to. On cross-examination it is apparent that Easter refers to Derek Coleman.

John David Woodard testified that he would call Hunter and tell him he was looking for something [methamphetamine] and Hunter would say "Okay. Well, go to the Dairy." Woodard would go to the Dairy and somebody would meet him there, usually Derek Coleman, and Woodard would hand over $100 and receive one gram of meth. On cross-examination, Woodard testified that Hunter would never tell him who to go see, "[h]e would just say to go someplace and then somebody would come."

Jessica Giles said under oath that she received drugs from Hunter in exchange for money or sex on a regular basis. On 15 December 2011 she helped Officer Crawford with his investigation by wearing a recording device and was given $100 in buy money. Giles went to the Ponderosa, and Hunter tried to get her to have sex with him; she refused and put money on a counter. According to Giles, Hunter "got nervous" and told her to sit in the car. A man who called himself J.J. got in the car with her and told her that Hunter had sent him there to give her drugs. State's Exhibits 8 and 9 were recordings Giles made at Officer Caldwell's request. These exhibits showed that she ultimately bought the drugs from J.J. Walker.

Officer Caldwell testified that he had surveilled the now infamous Ponderosa using confidential sources who would arrive there, get out with vehicles still running, go inside the Ponderosa, and come out a few seconds later, and report illegal activity.

2. *The CEO element and pulling it all together*

No single witness (1) testified that Hunter organized, supervised or managed a criminal enterprise and (2) identified five people who acted in concert with him. But there was testimony by Saquita Easter that Hunter exerted control over three people: John

Armstrong, Dexter Greene, and Derek Coleman. And Barry Poindexter agreed that Hunter had recruited him as a drug dealer. That's four people.

The State's case was additionally based on circumstantial evidence from which the circuit court could reasonably infer that Hunter was the leader of a drug operation. FBI Special Agent Forrest Avery Benham testified that Hunter was a dealer who moved a "fair amount of narcotics" in the area. He based his opinion on the drugs found in Hunter's residence and Hunter's confession to him. Law-enforcement officers also found large amounts of cash on Hunter's person in a traffic stop and on a Greyhound bus, which they implied was consistent with the practice of drug dealers. Easter said that Hunter would take Miller $20,000 to $30,000 in Dallas. Agent Benham testified that Miller was later convicted of drug trafficking. What's more, the State offered circumstantial evidence that methamphetamine buyers would call Hunter, and Hunter would direct his various dealers when and where to meet the buyers with the drugs. The State established this through the testimony of its witnesses Rachel Cole, Donnell Burnell, Anna Estes, Jessica Giles, John David Woodard, and Ashley Ellis, among others.

Here, the circumstantial evidence and direct testimony was sufficient to support the court's conclusion that Hunter exerted some type of influence over five (or more) people. Their compliance with his directions or instructions make the case. In the end, we are satisfied that the evidence sufficiently supports the conclusion that Hunter's drug operation included at least Derek Hunter, Derek Coleman, J.J. Walker, John Armstrong, Dexter Greene, Cadetric Box, Barry Poindexter, and Corey Briggs—and Hunter was the CEO.

D.  Hunter Received Substantial Income From Drug Deals

As a final point, Hunter argues that the State did not prove beyond a reasonable doubt that he realized substantial income or resources from an ongoing narcotics enterprise. We disagree.

The State presented testimony from Hunter's past romantic relationships.  Ashley Martin testified that she traded sex for drugs with Hunter and became pregnant by him in 2009.  She said that he had a car-detail shop at one time, that he worked, but she did not ever see him there.  According to Martin, Hunter provided about $500–$600 in five years to support the child she had with him.  Kellie Dover testified that Hunter would give her money from time to time—"$20 here and $30 there"—to support the child they had together.  She said that Hunter had fifteen kids and was not "rolling in a lot of money." Dover also testified that Hunter did not have a job.  Ava Brown testified that she had a child with Hunter in 2007 and that he has helped her some financially—"$100, $150 here and there."  Taiwashan Satterwhite testified that she and Hunter lived together and had biological children together.  According to Satterwhite, Hunter worked at John Deere "a long time ago," but she never saw his paycheck and that he did not pay more than $200 to $300 a month to help support her and the children.  On cross-examination, she said that he provided her with a used car and that he filed tax returns but did not receive refunds because "child support took it."

Dr. Lupetha Rasheed testified in Hunter's defense.  She said that Hunter was a part of a social entrepreneurship project, and he worked at a detail shop that she opened in January 2013.  She explained that Hunter made deposits for her business, averaging between

$2,000 and $3,000 per month, and that the State had wrongly seized some of that money in a civil-forfeiture action but she could not get the money back because it was being held as evidence.

Given all of the testimony we have recited previously, we hold that the State's proof was sufficient. The record as a whole supports the conclusion that Hunter was unemployed or underemployed during most of the seven-year period at issue; yet he was shown to have had large amounts of cash at various times. Hunter himself admitted receiving income from selling methamphetamine, and Officer Avery testified that he thought Hunter received around $39,000 in three years. Easter testified that she saw Hunter with up to $30,000 cash at one time, and he was stopped by law enforcement on a Greyhound bus with over $10,000 on his person for an unexplained reason. Dr. Rasheed's body shop was not opened until 2013, the year Hunter was arrested on the continuing-criminal-enterprise charge, and it was undisputed that he had not been employed at John Deere for a long time. Yet from 2007 to 2013 he provided financial gifts and support to his girlfriends and numerous children and had large amounts of cash on his person at various times. The circuit court could reasonably infer that Hunter derived substantial income from selling methamphetamine, and the State provided sufficient evidence to indicate Hunter's guilt and exclude every other reasonable hypothesis. We affirm on this point.

## II. *The Circuit Court's Sentence*

Sentencing in Arkansas is statutory. *Gray v. State*, 2014 Ark. 417, 443 S.W.3d 545 (per curiam). No sentence may be imposed unless a statute so permits. *Atkins v. State*, 2014 Ark. 393, 441 S.W.3d 19. The supreme court has said that an illegal sentence may be

corrected by the appellate courts on their own initiative. *Cook v. State*, 46 Ark. App. 169, 878 S.W.2d 765 (1994) (citing *Harmon v. State*, 317 Ark. 47, 876 S.W.2d 240 (1994)). A void or illegal sentence is one that fails on its face. *Lovelace v. State*, 301 Ark. 519, 785 S.W.2d 212 (1990). If a sentence is within the limits set by statute, however, then it is legal. *Grissom v. State*, 2013 Ark. 417. We have an illegal sentence in this case that requires correction.

## A. Hunter's Illegal Sentence

The plain language of the appealed sentencing order shows that Hunter was given 70 years' imprisonment in the Arkansas Department of Correction and 10 years' SIS for one count of engaging in a continuing criminal enterprise. The order also provides that an 840-months period of confinement accompanies the SIS. The order thus presents a couple of problems. (Given the interrelated nature of the sentencing statutes and our detailed discussion of them and the order, we have appended the complete four–page sentencing order to this opinion.)

Ark. Code Ann. § 5-64-405 (Supp. 2013) provides:

> (b)(1) A person who engages in a continuing criminal enterprise upon conviction is guilty of an unclassified felony and shall be sentenced to a term of imprisonment up to two (2) times the term otherwise authorized for the underlying offense referenced in subdivision (a)(1) of this section and shall be fined an amount up to two (2) times that authorized for the underlying offense referenced in subdivision (a)(1) of this section.

> (2) For any purpose other than disposition, engaging in a continuing criminal enterprise is a Class Y felony.

> (c)(1) A person who violates subsection (a) of this section after a previous conviction under subsection (a) of this section has become final upon conviction is guilty of an unclassified felony and shall be punished by a term of imprisonment not exceeding three (3) times that authorized for the

underlying offense referenced in subdivision (a)(1) of this section and a fine not exceeding three (3) times the amount authorized for the underlying offense referenced in subdivision (a)(1) of this section.

(2) For any purpose other than disposition, engaging in a continuing criminal enterprise is a Class Y felony.

Here, the sentencing range for a first-time, continuing-criminal-enterprise conviction is linked to the primary, underlying drug offense—meaning the section (a)(1) offense. In other words, section (b)(1)'s sentencing range is tethered to the sentencing range of what we have been calling the primary offense (the section (a)(1) offense charged). And early on we said the primary offense (the (a)(1) offense)—without any help from the State— must have been the 2007 Class Y felony delivery of methamphetamine to Rachel Cole. Under the statute in force when the primary offense was committed, the sentencing range for delivery of methamphetamine was 10–40 years or life, and a $25,000 fine. *See* Ark. Code Ann. § 5-64-401 (now repealed). Arkansas Code Annotated section 5-64-405(b)(1) provides that the circuit court could imprison Hunter for up to two times the term allowed for the primary (a)(1) offense (the 2007 Class Y delivery of meth to Rachel Cole). Because Hunter did not receive life, the maximum time the court could impose was an aggregate term of 80 years; that number is double the 40-year maximum range for the Class Y felony for delivering meth to Rachel Cole. Ark. Code Ann. § 5-64-405(b)(1). Hunter's sentence is within the statutory limits.

But the court overstepped its authority when it sentenced Hunter to the 10 years' SIS for the continuing-criminal-enterprise charge. Arkansas Code Annotated section 5-64-405 forbids that disposition:

(e) An offender found guilty of a violation of this section shall not:

(1) Have his or her sentence suspended;
(2) Be placed on probation;
(3) *Have imposition of sentence suspended*;
(4) Have the execution of the sentence deferred;
(5) Have the sentence deferred; or
(6) Be eligible for § 16–93–301 et seq.

Ark. Code Ann. § 5-64-405(e)(3) (emphasis added). Arkansas Code Annotated section 5-4-104(e)(1)(A)(vi) also states that suspended imposition of sentences are not allowed for continuing-criminal-enterprise convictions. Ark. Code Ann. § 5-64-104 (e)(1)(A) ("The court shall not suspend imposition of sentence as to a term of imprisonment nor place the defendant on probation for the following offenses . . . . (vi) Engaging in a continuing criminal enterprise, § 5-64-405."). We must therefore strike the 120 months' SIS portion of the circuit court's sentencing order because it is not allowed. We also strike the 840-month period of confinement accompanying probation or SIS that is marked in the sentencing order because Hunter could not be placed on probation or SIS for a continuing-criminal-enterprise conviction.

Recall the list of prohibited sentences listed in section 5-64-405 (with emphases added):

(e) An offender found guilty of a violation of this section shall not:

(1) Have his or her sentence suspended;
(2) *Be placed on probation*;
(3) *Have imposition of sentence suspended*;
(4) Have the execution of the sentence deferred;
(5) Have the sentence deferred; or
(6) Be eligible for § 16–93–301 et seq.

Next, we turn to the habitual-offender enhancement. As we stated earlier, the State charged Hunter as a habitual offender under Arkansas Code Annotated section 5-4-

501(a)(1). While the State presented evidence of prior convictions, the circuit court did not find that Hunter was a habitual offender in its oral rulings. Additionally, the first-offense (engaging in a continuing criminal enterprise) section in the sentencing order was not marked to show that Hunter was, in fact, sentenced as a habitual offender. In other words, the court made no mark in the habitual-offender box (pursuant to Arkansas Code Annotated section 5-4-501). The third page of the sentencing order, however, identifies "5-4-501 Habitual Offender" as a separate offense, with a separate sentence of 70 years' imprisonment and 10 years' SIS. But nothing in the order indicates whether this habitual-offender sentence runs consecutive to or concurrent with the first offense (the continuing-criminal-enterprise conviction). The "total time to be served for all offenses" stated in the appealed sentencing order is 840 months (70 years).

The bottom-line problem is Hunter was only charged with only one crime: engaging in a continuing criminal enterprise. And the habitual-offender statute, in the phrase of the case law, "does not create a distinct additional offense or independent crime but simply affords evidence to increase the punishment and to furnish a guide for the court or jury in fixing the final punishment in event of conviction of the offense charged." *Traylor v. State*, 304 Ark. 174, 176, 801 S.W.2d 267, 268 (1990); Ark. Code Ann. §§ 5-4-501 to – 505. The circuit court separately sentenced Hunter to 70 years' imprisonment and 10 years' SIS under the "5-4-501 Habitual Offender" statute. But the habitual-offender status is not a separate crime or offense. So on remand the sentencing order must be corrected to show that Hunter was convicted of only one offense: engaging in a continuing criminal

enterprise. We affirm, however, the sentencing order's statement that the total time Hunter received as a sentence on all offenses is 840 months (70 years).

### B. The Circuit Court's Upward Deviation from the Sentencing Standards

Hunter's second point on appeal is that the circuit court abused its discretion when it deviated upward by 250% from the Arkansas Sentencing Commission's presumptive sentence of 240 months' imprisonment when it sentenced him to 840 months' imprisonment. We review this point for an abuse of discretion. *Whittier v. State*, 2015 Ark. App. 536.

The Arkansas Sentencing Standards recommend similar sentences for similar offenders, with similar criminal histories. Ark. Code Ann. § 16-90-801 (Repl. 2016). This helps ensure that sanctions imposed are proportional to the seriousness of the offense of the conviction and an offender's criminal history. Ark. Code Ann. § 16-90-801(b), (c). Applying the sentencing standards is, however, a voluntary process. A circuit court can deviate from the presumptive sentence without providing a written justification for doing so. Ark. Code Ann. §§ 16-90-803, −804(a).

Under the voluntary, presumptive standards, there is a grid. Two dimensions of the grid represent the primary determinants of a sentence—the offense's seriousness and the offender's history. Ark. Code Ann. § 16-90-803(b). The Arkansas Sentencing Commission classifies the seriousness of engaging in a continuing criminal enterprise as a Level 9 Y offense. Ark. Code R. 154.00.1-III-1 (Weil 1994). On remand, the seriousness-level box should be marked level 9, not 8. Offender criminal history is determined by referring to Arkansas Code Annotated section 16-90-803, which allocates points for different levels of

SLIP OPINION

prior offenses. Because Hunter's prior felony records were more than fifteen years old, and his prior misdemeanor record was more than ten years old, they do not count toward his criminal history under the presumptive standards. Ark. Code Ann. § 16-90-803(C)(v)(b)–(c). Consequently, Hunter's criminal-history score is 0, which is what he argued to the circuit court during the sentencing hearing. The sentencing order, however, gave Hunter a mistaken criminal-history score of 2.

Hunter is correct that the presumptive sentence is 240 months (20 years), given his criminal-history score (0) and the seriousness level of the crime (9). Ark. Code R. 154.00.1-III-1. On remand, the presumptive sentence listed in the sentencing order (184.80 months) should be corrected to 240 months. But determining the presumptive sentence for Hunter's continuing-criminal-enterprise conviction is not the end of the process. Departure criteria and procedures are determined by statute. *See* Ark. Code Ann. § 16-90-804. The circuit court added 50 years to the presumptive sentence of 20 years. Here is what the court wrote to support such an upward departure:

> The offense was a major controlled substance offense if two or more of the following are present: (a) Three or more separate transactions involve sale, transfer or possession with intent; (b) Amounts substantially larger than the statutory minimum which defines the offense; (c) Offense involved a high degree of planning or occurred over a lengthy period of time or involved a broad geographic area; (d) Offender occupied a high position in the drug distribution hierarch; (e) Offender misused position of trust or status or fiduciary duty to facilitate commission; (f) Offender has received substantial income or resources from drug trafficking.

Given the novella-length testimony recited in this opinion against Hunter, and because the presumptive sentencing standards are merely advisory, we hold that the court did not abuse its discretion by departing from the presumptive sentence of 20 years' imprisonment and

imposing 70 years' imprisonment against Hunter on the continuing-criminal-enterprise conviction.

### III.  *Conclusion*

Hunter's continuing-criminal-enterprise conviction—and the circuit court's decision to impose a 70-year sentence on that charge—is affirmed.  But we remand this case to the court to correct its sentencing order in some particulars.  To summarize, on the continuing-criminal-enterprise charge, we strike the 120 months' SIS and the 840-month period of confinement accompanying the SIS because the statutes do not support those dispositions.  Also on remand, the criminal-history score should be a 0, the seriousness level should be a 9, and the presumptive sentence should be 240 months.  Finally, the total sentence imposed should be 840 months; and there should be no separate offense titled "habitual offender."

Affirmed as modified; remanded to correct the sentencing order.

HIXSON and BROWN, JJ., agree.

*Terrence Cain*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Evelyn D. Gomez*, Ass't Att'y Gen., for appellee.

SLIP OPINION

## SENTENCING ORDER

FILED
2015 APR 28 PM 4 32
COLUMBIA COUNTY, AR
PHYLLIS DIXON HILL
CIRCUIT CLERK

IN THE CIRCUIT COURT OF Columbia COUNTY, ARKANSAS,
13th JUDICIAL DISTRICT 5th DIVISION

On 3-19-2015 the Defendant appeared before the Court, was advised of the nature of the charge(s), of Constitutional and legal rights, of the effect of a guilty plea upon those rights, and of the right to make a statement before sentencing.

**Offender**

| Defendant [Last, First, MI] Hunter, Michael | DOB ▓▓▓ | Sex ☑ Male ☐ Female | Total Number of Counts 1 |

SID # 6 6 7 2 2
Race & Ethnicity ☐ White ☑ Black ☐ Asian ☐ Native American ☐ Pacific Islander ☐ Unknown ☐ Other ☐ Hispanic

Supervision Status at Time of Offense

**Court Info**

Judge David W. Talley, Jr.

Prosecuting Attorney/Deputy Ryan Phillips

Defendant's Attorney Greg Bryant
☑ Private ☐ Public Defender
☐ Pro Se ☐ Appointed

File Stamp

Change of Venue ☐ Yes ☑ No
If yes, from:

**Legal Statement**

☐ Pursuant to A.C.A. ☐ §§16-93-301 et seq., or ☐ §§_____ this Court, without making a finding of guilt or entering a judgment of guilt and with the consent of the Defendant defers further proceedings and places the Defendant on probation.

There being no legal cause shown by the Defendant, as requested, why judgment should not be pronounced, a judgment:

☐ is hereby entered against the Defendant on each charge enumerated, fines levied, and court costs assessed. Defendant was advised of the conditions of the sentence and/or placement on probation and understands the consequences of violating those conditions. The Court retains jurisdiction during the period of probation/suspension and may change or set aside the conditions of probation/suspension for violations or failure to satisfy Department of Community Correction (D.C.C.) rules and regulations.

☑ of conviction is hereby entered against the Defendant on each charge enumerated, fines levied, and court costs assessed. The Defendant is sentenced to the Arkansas Department of Correction (A.D.C.) for the term specified on each offense shown below.

Defendant made a voluntary, knowing, and intelligent waiver of the right to counsel. ☐ Yes ☐ No

A.C.A. # of Offense/ Name of Offense+ 5-64-405 Engaging in a Continuing Criminal Enterprise
Case # 2013-60

A.C.A. # of Original Charged Offense CR20045705403
Offense was ☐ Nolle Prossed ☐ Dismissed ☐ Acquitted
Appeal from District Court ☐ Yes ☑ No | Probation/SIS Revocation+ ☐ Yes ☑ No

**Offense #1**

Offense Date 2011-2013
Offense is ☑ Felony ☐ Misd. ☐ Viol.
Offense Classification ☑ Y ☐ A ☐ B ☐ C ☐ D ☐ U

| Number of Counts: 1 | Criminal History Score 2 | Seriousness Level 8 | Defendant ☐ Attempted ☐ Solicited ☐ Conspired to commit the offense |

Presumptive Sentence ☑ Prison Sentence of 84 80 months ☐ Community Corrections Center ☐ Alternative Sanction

Defendant Sentence* (see Page 2)
Imposed ☑ ADC ☐ Jud. Tran. ☐ County Jail

840 months

Probation _____ months

SIS 120 months

Other ☐ Life ☐ LWOP ☐ Death

If probation or SIS accompanied by period of confinement, state time: _____ days or 840 months.

Sentence was enhanced _____ months, pursuant to A.C.A. §§ _____

Enhancement(s) is to run: ☐ Concurrent ☐ Consecutive.

Defendant was sentenced as a habitual offender, pursuant to A.C.A. §5-4-501, subsection ☐ (a) ☐ (b) ☐ (c) ☐ (d)

Victim Info# (See page 2) ☐ N/A [Multiple Victims ☐ Yes ☐ No]
Age _____
Sex ☐ Male ☐ Female
Race & Ethnicity ☐ White ☐ Black ☐ Asian ☐ Native American ☐ Pacific Islander ☐ Other ☐ Unknown ☐ Hispanic

Defendant voluntarily, intelligently, and knowingly entered a
☐ negotiated plea of ☐ guilty or ☐ nolo contendere.
☐ plea directly to the court of ☐ guilty or ☐ nolo contendere.

Defendant:
☐ was sentenced pursuant to ☐ §§16-93-301 et seq., or ☐ other §§ _____
☐ entered a plea and was sentenced by a jury.
☑ was found guilty by the court & sentenced by ☑ court ☐ jury.
☐ was found guilty at a jury trial & sentenced by ☐ court ☐ jury.
☐ was found guilty of lesser included offense by ☐ court ☐ jury.

Sentence is a Departure ☑ Yes ☐ No
Sentence Departure is ☐ Durational or ☐ Dispositional.
If durational, state how many months above/below the presumptive sentence: _____

Departure Reason (See page 2 for a list of reasons)
Aggravating # 4 or Mitigating # _____. For Agg. #16 or Mit. #10, or if departing from guidelines, please explain: _____

Sentence will run: ☐ Consecutive ☐ Concurrent
to Offense # _____ or
Case # _____

0092

SLIP OPINION

Defendant's Full Name: Hunter, Michael

| Reasons for Departure (Please see complete list of departure criteria found at A.C.A. §16-90-804) | |
| --- | --- |
| **Aggravating** | **Mitigating** |
| 1. Offender's conduct manifested extreme cruelty during commission of current offense. | 1. Victim played an aggressive role or provoked the incident or was a willing participant. |
| 2. Offender knew victim vulnerable due to extreme youth, advanced age, disability or ill health. | 2. Offender lacked capacity of judgment due to mental or physical impairment. |
| 3. Offense was major economic offense established by one of the following criteria: (a) multiple victims/incidents, (b) monetary loss substantially greater than typical, (c) degree of sophistication or time, (d) misuse of fiduciary duty, or (e) other similar conduct. | 3. Offender played a minor or passive role in crime. |
| | 4. Offender compensated/made effort to compensate for damage or injury before detection. |
| 4. Offense was major controlled substance offense if two or more of the following are present: (a) Three or more separate transactions involve sale, transfer or possession with intent; (b) Amounts substantially larger than the statutory minimums which define the offense; (c) Offense involved a high degree of planning or lengthy period or broad geographic area; (d) Offender occupied a high position in the drug distribution hierarchy; (e) Offender misused position of trust or status or fiduciary duty to facilitate commission; (f) Offender has received substantial income or resources from drug trafficking. | 5. Offender was lesser participant showing caution/concern for safety or well-being of victim. |
| | 6. Offender acted in response to continuing physical/sexual abuse by victim. |
| | 7. Policy on multiple offenses in single course of conduct in offender's prior criminal history results in sentence which is excessive for this offense. |
| | 8. Offender voluntarily admitted sexual offense and sought treatment before detection. |
| 5. Offender employed firearm in furtherance or flight unless such use is element of offense | 9. Offender made effort to provide assistance in investigation or prosecution of another as indicated by motion of state (can weigh timeliness of assistance, nature and extent of assistance, and truthfulness, completeness, and demonstrable reliability of info or testimony). |
| 6. Offense was sexual offense and part of pattern with the same or different victims under eighteen | |
| 7. Policy on multiple offenses in a single course of conduct in offender's prior criminal history results in a sentence that is clearly too lenient. | 10. Other |
| 8. Offense was committed in manner that exposed risk of injury to others. | |
| 9. Offense was a violent or sexual offense committed in victim's zone of privacy. | |
| 10. Offender attempted to cover offense by intimidation of witnesses, tampering of evidence, or misleading authorities. | |
| 11. Offense committed to avoid arrest or effect escape. | |
| 12. Offender lacks minimum insurance in a vehicular homicide. | |
| 13. Statutory minimum sentence overrides the presumptive sentence. | |
| 14. Multiple concurrent sentences being entered at this time require a higher sentence. | |
| 15. Sentence is higher as a result of other charges being dropped or merged. | |
| 16. Other | |

**NOTE:**

**\* Defendant Sentence.** "Imposed ADC" means incarceration in an Arkansas Department of Correction facility. "Imposed Judicial Transfer" means incarceration in a Department of Community Correction Center. "Imposed County Jail" means incarceration in a county jail facility. Indicate in months the total time the Defendant was sentenced to a term of incarceration. DO NOT INCLUDE TIME FOR SIS.

**# Victim Info.** For more than one victim, please use the "Additional Victim Information" page to disclose additional victim demographics. If there is no victim, check not applicable.

**+ A.C.A. # of Offense/Name of Offense & Probation/SIS Revocation.** If an offender is being sentenced as a result of a revocation of probation or SIS, check the box indicating this is a "Probation/SIS Revocation", and enter the A.C.A. number and name of the offense for which the defendant was originally convicted. Do not enter the code provision for revocation or the cause of the revocation.

0093

SLIP OPINION

Defendant's Full Name: **Hunter Michael**

**Offense #:**

| | |
|---|---|
| A.C.A. # of Offense/ Name of Offense+ | **5-4-501 Habitual Offender** |
| | Case # **2013-60** |
| A.C.A. # of Original Charged Offense | ATN **COL 00570540?** |

Offense was ☐ Nolle Prossed ☐ Dismissed ☐ Acquitted
Appeal from District Court ☐ Yes ☑ No | Probation/SIS Revocation+ ☑ Yes ☐ No

Offense Date: ____
Offense is ☐ Felony ☐ Misd. ☐ Viol. | Offense Classification ☐ Y ☐ A ☐ B ☐ C ☐ D ☐ U

Number of Counts: ____
Criminal History Score: ____
Seriousness Level: ____
Defendant ☐ Attempted ☐ Solicited ☐ Conspired to commit the offense

**Presumptive Sentence** ☐ Prison Sentence of ____ months ☐ Community Corrections Center ☐ Alternative Sanction

**Defendant Sentence*** (see Page 2)
Imposed ☑ ADC ☐ Jud. Tran. ☐ County Jail
**840** months
Probation ____ months
SIS **120** months
Other ☐ Life ☐ LWOP ☐ Death

If probation or SIS accompanied by period of confinement, state time: ____ days or ____ months.
Sentence was enhanced ____ months, pursuant to
A.C.A. §§ ____.
Enhancement(s) is to run: ☐ Concurrent ☐ Consecutive.
Defendant was sentenced as a habitual offender, pursuant to A.C.A. §5-4-501, subsection ☐ (a) ☐ (b) ☐ (c) ☐ (d)

Victim Info# (See page 2) ☐ N/A  Age ____
[Multiple Victims ☐ Yes ☐ No]
Sex ☐ Male ☐ Female
Race & Ethnicity ☐ White ☐ Black ☐ Asian ☐ Native American ☐ Pacific Islander ☐ Other ☐ Unknown ☐ Hispanic

Defendant voluntarily, intelligently, and knowingly entered a
☐ negotiated plea of ☐ guilty or ☐ nolo contendere.
☐ plea directly to the court of ☐ guilty or ☐ nolo contendere.

Defendant:
☐ was sentenced pursuant to ☐ §§16-93-301 et seq., or ☐ other §§ ____
☐ entered a plea and was sentenced by a jury.
☑ was found guilty by the court & sentenced by ☑ court ☐ jury.
☐ was found guilty at a jury trial & sentenced by ☐ court ☐ jury.
☐ was found guilty of lesser included offense by ☐ court ☐ jury.

Sentence is a Departure ☐ Yes ☐ No
Sentence Departure is ☐ Durational or ☐ Dispositional.
If durational, state how many months above/below the presumptive sentence: ____

Departure Reason (See page 2 for a list of reasons)
Aggravating # ____ or Mitigating # ____. For Agg. #16 or Mit. #10, or if departing from guidelines, please explain: ____

Sentence will run: ☐ Consecutive ☐ Concurrent
to Offense # ____ or
Case # ____

---

**Offense #:**

| | |
|---|---|
| A.C.A. # of Offense/ Name of Offense+ | |
| | Case # |
| A.C.A. # of Original Charged Offense | ATN |

Offense was ☐ Nolle Prossed ☐ Dismissed ☐ Acquitted
Appeal from District Court ☐ Yes ☐ No | Probation/SIS Revocation+ ☐ Yes ☐ No

Offense Date: ____
Offense is ☐ Felony ☐ Misd. ☐ Viol. | Offense Classification ☐ Y ☐ A ☐ B ☐ C ☐ D ☐ U

Number of Counts: ____
Criminal History Score: ____
Seriousness Level: ____
Defendant ☐ Attempted ☐ Solicited ☐ Conspired to commit the offense

**Presumptive Sentence** ☐ Prison Sentence of ____ months ☐ Community Corrections Center ☐ Alternative Sanction

**Defendant Sentence*** (see Page 2)
Imposed ☐ ADC ☐ Jud. Tran. ☐ County Jail
____ months
Probation ____ months
SIS ____ months
Other ☐ Life ☐ LWOP ☐ Death

If probation or SIS accompanied by period of confinement, state time: ____ days or ____ months.
Sentence was enhanced ____ months, pursuant to
A.C.A. §§ ____
Enhancement(s) is to run: ☐ Concurrent ☐ Consecutive.
Defendant was sentenced as a habitual offender, pursuant to A.C.A. §5-4-501, subsection ☐ (a) ☐ (b) ☐ (c) ☐ (d)

Victim Info# (See page 2) ☐ N/A  Age ____
[Multiple Victims ☐ Yes ☐ No]
Sex ☐ Male ☐ Female
Race & Ethnicity ☐ White ☐ Black ☐ Asian ☐ Native American ☐ Pacific Islander ☐ Other ☐ Unknown ☐ Hispanic

Defendant voluntarily, intelligently, and knowingly entered a
☐ negotiated plea of ☐ guilty or ☐ nolo contendere.
☐ plea directly to the court of ☐ guilty or ☐ nolo contendere.

Defendant:
☐ was sentenced pursuant to ☐ §§16-93-301 et seq., or ☐ other §§ ____
☐ entered a plea and was sentenced by a jury.
☐ was found guilty by the court & sentenced by ☐ court ☐ jury.
☐ was found guilty at a jury trial & sentenced by ☐ court ☐ jury.
☐ was found guilty of lesser included offense by ☐ court ☐ jury.

Sentence is a Departure ☐ Yes ☐ No
Sentence Departure is ☐ Durational or ☐ Dispositional.
If durational, state how many months above/below the presumptive sentence: ____

Departure Reason (See page 2 for a list of reasons)
Aggravating # ____ or Mitigating # ____. For Agg. #16 or Mit. #10, or if departing from guidelines, please explain: ____

Sentence will run: ☐ Consecutive ☐ Concurrent
to Offense # ____ or
Case # ____

0094

SLIP OPINION

Defendant's Full Name: Hunter, Michael

| Sex Offenses | Domestic Violence Offenses |
|---|---|
| Defendant has been adjudicated guilty of an offense requiring sex offender registration and must complete the Sex Offender Registration Form. ☐Yes ■No | Defendant has been adjudicated guilty of a domestic-violence related offense. ☐Yes ■No |
| Defendant has committed an aggravated sex offense as defined in A.C.A. §12-12-903. ☐Yes ■No | If no, was defendant originally charged with a domestic-violence related offense? ☐ Yes ■ No If yes, state the A.C.A. # of the offense: |
| Defendant is alleged to be a sexually violent predator and is ordered to undergo an evaluation at a facility designated by A.D.C. pursuant to A.C.A. §12-12-918. ☐Yes ■No | |
| Defendant, who has been adjudicated guilty of an offense requiring registration, has been adjudicated guilty of a prior sex offense under a separate case number. ☐ Yes ■No If yes, list prior case numbers: | If yes to either question, identify the relationship of the victim to the defendant. |

**Special Conditions**

| DNA Sample/Qualifying Offense | Drug Crime |
|---|---|
| Defendant has been adjudicated guilty of a qualifying offense or repeat offense (as defined in A.C.A. §12-12-1103). ■Yes ☐No Defendant is ordered to have a DNA sample drawn at ☐ a A.C.C. facility ■the A.D.C. or ☐ other _____ | Defendant has been convicted of a drug crime, as defined in §12-17-101. ■Yes ☐No |

**Fines, Fees, Restitution**

| | | |
|---|---|---|
| Court Costs | $150.00 | Restitution $_____ Payable to [If multiple beneficiaries, give names and payment priority]_____ |
| Fines | $50,000.00 | Terms |
| Booking/Admin Fees ($20) | $20.00 | ☐Due Immediately |
| Drug Crime Assessment Fee ($125) | $125.00 | ☐Installments of: _____ |
| DNA Sample Fee ($250) | $ | ☐Payments must be made within _____ days of release from A.D.C. |
| Mandatory Sex Offender Fee ($250) | $ | ☐Upon release from confinement, Defendant must return to court to establish payment of restitution |
| Public Defender User Fee | $ | |
| Public Defender Attorney Fee | $ | ☐Restitution is joint and several with co-defendant(s) who was found guilty – List |
| Other (explain) | $ | name(s) and case number(s) _____ |

**Sentence Options**

Defendant was convicted of a target offense(s) and is sentenced pursuant to provisions of the Community Punishment Act. ☐ Yes ■ No

The Court hereby orders a judicial transfer to the Department of Community Correction. ☐ Yes ■ No

Pursuant to the Community Punishment Act, the Defendant shall be eligible to have his/her records sealed. ☐ Yes ■ No

| Extended Juvenile Jurisdiction Applied ☐Yes ☐No |

| JAIL TIME CREDIT 81 days | TOTAL TIME TO BE SERVED FOR ALL OFFENSES In months: 840 ☐Life ☐LWOP | Death Penalty ☐Yes ☐No | If Yes, State Execution Date: |
|---|---|---|---|

DEFENDANT IS ASSIGNED TO? ■ ADC ☐ CCC ☐ COUNTY JAIL ☐ PROBATION ■ SIS ☐ SPECIAL CONDITIONS

Conditions of disposition or probation are attached. ☐Yes ■No

A copy of the pre-sentence investigation on sentencing information is attached ☐Yes ☐No

A copy of the Prosecutor's Short Report is attached ■Yes ☐No

☐ Defendant has previously failed a drug court program.

DEFENDANT WAS INFORMED OF APPELLATE RIGHTS ■Yes ☐No Appeal Bond $

The County Sheriff is hereby ordered to: ☐transport the defendant to county jail ☐take custody for referral to CCC ■transport to ADC

Defendant shall report to ACC probation officer for report date to CCC ☐ Yes ☐ No

**Signature**

Prosecuting Attorney/Deputy (Print Name): Ryan P. Phillips

Signature: Ryan Phillips     Date: 4-27-15

Circuit Judge (Print Name): David W. Talley, Sr.

Signature: _____     Date: April 28 2015

Additional Info: _____

Appellant's
Addendum 00095